Filed 10/31/14

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| ALBERT THOMAS PAULEK, | |
| Plaintiff and Appellant, | E060038 |
| v. | (Super.Ct.No. RIC1120142) |
| CALIFORNIA DEPARTMENT OF WATER RESOURCES, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County. Daniel A. Ottolia, Judge. Affirmed.

Susan E. Nash for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Robert W. Byrne, Assistant Attorney General, and Eric M. Katz, Deputy Attorney General, for Defendant and Respondent.

Plaintiff and appellant Albert Thomas Paulek appeals the denial of his petition for a writ of mandate under the California Environmental Quality Act (CEQA). He seeks a writ directing defendant and respondent California Department of Water Resources (Department) to vacate its approval of the final environmental impact report (EIR) with

1

respect to the Perris Dam Remediation Project. In its draft EIR, the Department proposed three activities: (1) remediating structural deficiencies in the Perris Dam, (2) replacing the facility's outlet tower, and (3) creating a new "Emergency Outlet Extension." In response to comments on the draft EIR, the emergency outlet extension was split off into a separate environmental review process, and the final EIR at issue considers only dam remediation and outlet tower replacement.

Paulek contends on appeal that the lack of an emergency outlet extension constitutes a significant environmental impact that the project as finally approved fails to mitigate, and that the separation of the emergency outlet extension into a different project constitutes impermissible segmentation. He further contends that the Department did not adequately respond to written comments submitted by "Friends of the Northern San Jacinto Valley," an organization of which Paulek is the "Conservation Chair."[1] In response, the Department argues that Paulek lacks standing, and the petition in any case fails on its merits.

For the reasons discussed below, we agree with the trial court that Paulek has standing, and find no abuse of discretion in its denial of the petition on its merits. We therefore affirm.

---

[1] Paulek brought suit on his own behalf, rather than as an organizational representative; Friends of the Northern San Jacinto Valley is not party to the present action.

## I. FACTS AND PROCEDURAL BACKGROUND

Perris Dam and Reservoir is a multipurpose facility known collectively as Lake Perris, located within the Lake Perris State Recreation Area in Riverside County. Perris Dam was built in 1972. A foundation study of the dam—completed by the Department in 2005 and utilizing recent significant advances in soil liquefaction engineering—showed structural deficiencies in its capacity to withstand seismic events not revealed in earlier studies. The 2005 report recommended immediately reducing the water level in the reservoir, remediation measures to improve the long-term seismic stability of the dam's foundation, and further study, including a seismic review of the dam's outlet tower.[2]

The Department responded to the first recommendation of the report by reducing the amount of water held by the dam by about 40 percent. Department staff also developed a proposal for long-term improvements to the dam with three parts: (1) remediation of the structural deficiencies in the dam's foundation through various measures; (2) replacement of the facility's existing outlet tower, the structural integrity of which was found upon further seismic review to be deficient; and (3) construction of a new "emergency outlet extension."

The third part of the planned improvements, the emergency outlet extension, was not recommended or even considered by the 2005 report. The Department proposed it, however, because the emergency water release facilities of the dam, as originally

---

[2] The outlet tower is a 105-foot-tall freestanding structure containing a number of valves at various elevations, the function of which is to convey water to The Metropolitan Water District of Southern California's delivery facility located near the dam, and to allow for release of water during emergencies.

3

constructed, were designed to discharge water overland, inundating up to 2700 acres of flood plain downstream from the dam, and allowing the water to find its own path to the Perris Valley Storm Drain. Since the dam's construction in 1972, however, substantial residential developments had been built in that previously-empty flood plain. The emergency outlet extension would create a safe route—a two-mile-long path, either underground or in an open channel—for such water to flow, if necessary.

On June 1, 2007, the Department issued a notice of preparation of a draft EIR regarding the three-part proposal. The written comments received in response to the notice of preparation include, as relevant here, comments from Friends of the Northern San Jacinto Valley, an organization with which Paulek is associated, but which were drafted for the signature of the organization's president, Ann L. Turner-McKibben.

In January 2010, the Department issued a draft EIR for the "Perris Dam Remediation Program," analyzing the environmental impacts of the three-part proposal. On February 3, 2010, the Department conducted a public workshop to discuss the draft EIR and the proposed activities. Paulek participated in this meeting, as will be discussed in more detail below. Additionally, on April 10, 2010, Friends of the Northern San Jacinto Valley submitted written comments with respect to the draft EIR, signed by Paulek in his capacity as "Conservation Chair" of that organization.

In the final EIR, dated September 2011, the Department removed the emergency outlet extension component of the proposal; this change was in response to comments

4

received suggesting consideration of new alternatives.[3]  With respect to the dam

remediation and outlet tower replacement portions, the Department certified the final EIR

on November 18, 2011, and issued a notice of determination.

Paulek filed his initial petition for a writ of mandate on December 21, 2011; the

operative first amended petition was filed August 7, 2012.  On September 27, 2013, the

trial court heard oral argument with respect to the first amended petition.  On October 1,

2013, the trial court issued a minute order denying the first amended petition, attaching a

14-page "Subsequent Ruling on Submitted Mandamus Petition" explaining its decision.

Judgment was entered on October 24, 2013.

## II.  DISCUSSION

### A.  Paulek Satisfied CEQA Prerequisites for Bringing His Petition.

The Department contends Paulek "lacks standing" to challenge the project

approval because he failed to comply with the requirements of Public Resources Code

section 21177, subdivision (b).[4]  The Department argues that Paulek's comments during

the public hearing on the project constituted questions, but not objections, and therefore

do not satisfy the prerequisite for bringing a petition to challenge the Department's

approval of the final EIR.  We are not persuaded.

---

[3] The various alternatives for the emergency outlet extension are being considered
as a separate project with a separate CEQA review.  The trial court took judicial notice of
the notice of preparation for the "DWR Perris Dam Emergency Release Facility Project
EIR," issued on September 9, 2013, as well as a printout of a PowerPoint presentation
made at the scoping meeting for that project, held September 19, 2013.

[4] Further statutory references are to the Public Resources Code unless otherwise
indicated.

5

"'Only a proper party may petition for a writ of mandate to challenge the sufficiency of an EIR or the validity of an act or omission under CEQA.'"[5] (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 889.) Section 21177 requires a petitioner to have "objected to the approval of the project orally or in writing during the public comment period provided by this division or prior to the close of the public hearing on the project before the filing of the notice of determination pursuant to Sections 21108 and 21152." (§ 21177, subd. (b).) "'[G]eneralized environmental comments'" or "'relatively . . . bland and general references to environmental matters'" or "'isolated and unelaborated comment[s]'" are insufficient, but comments need only "'"'be sufficiently specific so that the agency has the opportunity to evaluate and respond to them'"'" to constitute an objection that confers standing. (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 536.) Any person who objected to a CEQA approval on some ground may also raise issues presented to the agency by any other person who objected. (§ 21177, subd. (a); see *Maintain Our Desert Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430, 439 [Fourth Dist., Div. Two] ["[section 21177] permits any person who objected to raise any ground asserted as an objection by any other objecting party"].)

---

[5] Whether section 21177, subdivision (b) is better viewed as a requirement to obtain standing or an application of the exhaustion of administrative remedies doctrine is an academic debate in which we need not take sides. (See *Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 589-591 [discussing whether section 21177 is properly considered an exhaustion of remedies statute or a standing requirement].) Either way, satisfaction of section 21177, subdivision (b) is a "jurisdictional prerequisite to maintenance of a CEQA action." (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1199.)

At the public workshop with respect to the draft EIR, Paulek expressed concern that the proposed remediation measures with respect to Perris Dam's structural integrity, as he understood them, were insufficient, commenting: "[O]ne thing that's not clear to me is will this solution fix the problem? . . . [¶] It . . . looks like you're building another dam in front of the existing dam. . . . [¶] . . . [¶] . . . Is this going to work?" He asked a further question about why the capacity of the proposed emergency outlet extension, which was still a part of the project at the time, was less than the existing emergency release capability, implicitly expressing concern that the new structure's capacity would be sufficient.[6] These are not generalized environmental comments, but rather expressions of concern specifically regarding the proposed project—essentially, objections—that are sufficiently specific in both subject and level of detail to allow the Department to evaluate and respond to them. As such, Paulek satisfied the prerequisite codified in section 21177, subdivision (b), for bringing his petition.

The Department argues to the contrary that, because Paulek's comments were phrased as questions, they do not constitute objections in the meaning of section 21177. The Department presents no case law in support of its narrow definition of "objection," and we are aware of none. Moreover, a comment that raises questions about whether a proposed project will in fact solve the problem it is supposed to remedy is fairly understood as an expression of disapproval, no matter whether phrased as a declarative

_____

[6] According to the draft EIR, the existing emergency release structures were designed to accommodate the release of 3800 cubic feet per second of water; the proposed new emergency release structures would accommodate release of up to 1500 cubic feet per second.

7

sentence or a question. As such, it constitutes an "objection," even under the definition of the word proposed by the Department, adopted from an online dictionary, which includes "'a feeling or expression of disapproval.'" The same reasoning applies to a comment that raises questions about why a proposed structure that has less capacity than the one it is replacing.

The Department further suggests that Paulek should not be understood to have "objected" within the meaning of section 21177, subdivision (b), because he "raised no environmental issues whatsoever," instead only "ask[ing] questions about whether the project will achieve its objectives . . . ." This argument ignores that CEQA explicitly requires balancing of the expected benefits of a project against its unavoidable adverse environmental risks. (See Cal. Code Regs., tit. 14, § 15093, subd. (a) ["CEQA requires the decision-making agency to balance, as applicable, the economic, legal, social, technological, or other benefits . . . of a proposed project against its unavoidable environmental risks when determining whether to approve the project."].) An objection challenging a project's purported benefits is just as pertinent to the required balancing analysis as an objection regarding environmental risks, and is equally adequate for satisfying section 21177, subdivision (b).

In short, Paulek satisfied the prerequisites for bringing his petition articulated in section 21177, subdivision (b).[7] We turn now to the merits of the petition.

_____

[7] Having concluded that Paulek satisfied the requirements of section 21177, subdivision (b), we need not consider whether the exception to those requirements in section 21177, subdivision (e) applies, as Paulek has argued.

8

**B. Paulek's Challenges to the Department's Approval of the Final EIR Lack Merit.**

   *1. Standard of review.*

In reviewing compliance with CEQA, we review the agency's action, not the trial court's decision; "in that sense appellate judicial review under CEQA is de novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428.) The agency's action is reviewed for prejudicial abuse of discretion. (§ 21168.5.) An agency abuses its discretion if it fails to proceed in a manner required by law or if substantial evidence in the record does not support the agency's decision. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117.) "[A]n EIR is presumed adequate [citation], and the [petitioner] in a CEQA action has the burden of proving otherwise." (*State of California v. Superior Court* (1990) 222 Cal.App.3d 1416, 1419.)

   *2. Removal of the emergency outlet extension from the final EIR does not leave a significant environmental impact of the project unmitigated.*

Paulek contends that the decision to remove the new emergency outlet extension from the project leaves a significant environmental impact of the project unmitigated, pointing to the flooding that would occur in residential areas downstream of the dam in the event of an emergency water release, absent the emergency outlet extension. This argument fails, because nothing in the administrative record suggests the proposed dam remediation or outlet tower replacement activities will cause or increase the risk of flooding that the emergency outlet extension is intended to remedy.

9

CEQA requires that public agencies "mitigate or avoid the significant effects on the environment *of projects that it carries out or approves* whenever it is feasible to do so." (§ 21002.1, subd. (b), italics added.) A project's environmental effects "are determined by comparison with the existing 'baseline physical conditions.'" (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1167.) Environmental problems that would continue to exist even in the absence of any project are "part of the baseline conditions rather than program-generated environmental impacts . . . ." (*Id.* at 1168.)

Here, the administrative record demonstrates, and Paulek has not contested, that in the absence of any project, the danger of flooding residential areas below Perris Dam in the event of an emergency release would remain; it is a product of the original design of the dam's emergency release facilities, which did not account for later-developed residential areas in the previously empty flood plain. The proposed dam remediation and outlet tower replacement would not increase that baseline danger. To the contrary, the Department concluded the dam remediation and outlet tower replacement "would not alter existing draining patterns or expose people to structures that could result in significant injury or death through flooding." Indeed, the two proposed activities, even without the emergency outlet extension, will *reduce* the baseline flooding danger; remediation of structural deficiencies in the dam and rebuilding the outlet tower to current seismic standards decreases the likelihood of dam failure, thereby reducing the likelihood any emergency release of water will be necessary. The flooding danger from the lack of an emergency outlet extension, therefore, is part of the baseline conditions that do not fall within the CEQA mitigation requirements.

10

Paulek misreads the final EIR when he infers that the Division of Safety of Dams (DSOD), which is a part of the Department, has imposed requirements regarding dam release capacity that require a different conclusion. Paulek here conflates two separate issues: (1) the emergency release capacity of the dam, and (2) preventing flooding of residential areas downstream from the dam in the event of an emergency release. Paulek cites to a Department response to a comment referencing a DSOD requirement that a dam facility be capable of drawing down 10 percent of its full capacity within 10 days, and noting that a controlled release of 1500 cubic feet per second is required to meet that capacity. Paulek ignores, however, that the dam as originally constructed meets that requirement; it is capable of releasing 3800 cubic feet per second. The emergency outlet extension originally proposed in the draft EIR, and now being considered in a separate CEQA process (see fn. 4, *ante*), would also meet the DSOD release capacity requirement, but with the additional benefit of not flooding residential areas beneath the dam in the process. It does not follow that the project for dam remediation and outlet tower replacement—which would have no effect on the current release capacity of the facility—cannot be approved except together in the same CEQA process with the emergency outlet extension, or that the DSOD release capacity requirement will remain unsatisfied upon completion of only the two-part program contemplated by the final EIR.

In short, Paulek fails to show any unmitigated environmental impact of the two-part program considered in the final EIR and approved by DWR.

11

*3. Considering alternatives for the emergency outlet extension in a separate CEQA process does not constitute improper segmentation.*

Paulek contends the deferral of the emergency outlet extension constitutes improper segmentation of the project, and that the emergency outlet extension "is an integral part of the Perris Dam Remediation Program and must be part of the [final EIR]." The Department disagrees, as do we.

It is well established that "'CEQA forbids "piecemeal" review of the significant environmental impacts of a project.'" (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1222 (*Banning Ranch*).) Rather, CEQA mandates "that environmental considerations do not become submerged by chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences." (*Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283-284 (*Bozung*).) Thus, the term "project" as used for CEQA purposes is defined broadly as "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Cal. Code Regs., tit. 14, § 15378, subd. (a).)

"Courts have considered separate activities as one CEQA project and required them to be reviewed together where, for example, the second activity is a reasonably foreseeable consequence of the first activity [citation]; the second activity is a future expansion of the first activity that will change the scope of the first activity's impacts [citation]; or both activities are integral parts of the same project [citation]." (*Sierra Club*

12

*v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 698 (*Sierra Club*)). Whether a project has received improper piecemeal review is a question of law that we review independently. (*Banning Ranch*, *supra*, 211 Cal.App.4th at p. 1224.)

There is no basis in the administrative record to conclude that the emergency outlet extension is a "reasonably foreseeable consequence" of the dam remediation and tower rebuilding projects. (See *Sierra Club*, *supra*, 128 Cal.App.4th at p. 698.) To be sure, as Paulek notes, all three activities are necessary to "remediate all the flood hazards present at Lake Perris." As discussed above, however, the need for an emergency outlet extension is not a *consequence* of the dam remediation or outlet tower reconstruction. Rather, it is necessitated by the original design of the dam's emergency release facilities, combined with the land use decisions resulting in construction of residential developments in a previously empty flood plain below the dam. This case is therefore distinguishable from cases where one stage of a project is the first domino to fall in a causally-related series of events to follow. (See *Bozung*, *supra*, 13 Cal.3d at p. 279 [agency's annexation of land was first step towards development of that land].) Neither does approval of the dam remediation and outlet tower replacement legally or practically compel completion of an emergency outlet extension. (See *Banning Ranch*, *supra*, 211 Cal.App.4th at p. 1223 [collecting cases where "reviewed project legally compels or practically presumes completion of another action"].)

Authority requiring separate activities to be reviewed together because a second activity is a "future expansion" of the first that will "change the scope of the first activity's impacts" is also inapplicable. (See *Sierra Club*, *supra*, 128 Cal.App.4th at p.

13

698.)  For example, in *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376 (*Laurel Heights*), the California Supreme Court required a project involving university research facilities moving into part of a newly-purchased building to be reviewed, together with plans to later occupy the remainder of the building, once the leases of other tenants expires.  (*Id.* at pp. 396-397.)  Thus, if the Department contemplated, say, remediation of structural deficiencies in the foundation of the right abutment of Perris Dam, but also anticipated performing similar work on the left abutment at a later time, *Laurel Heights* and similar authority might well require review of the two separate activities in a single EIR.  But those are not the facts of this case.  The emergency outlet extension of course has environmental impacts that are different from those of the dam remediation and outlet tower reconstruction emergency outlet extension.  But there is no basis to conclude that it is a "future expansion" of either of the other two projects.

Neither is there any basis to conclude that the emergency outlet extension is an "integral part of the same project" as the dam remediation and outlet tower replacement projects.  (See *Sierra Club*, *supra*, 128 Cal.App.4th at p. 698.)  Dam remediation and outlet tower replacement both are intended to improve the ability of the Lake Perris facility to withstand seismic events.  Those projects will both serve that purpose, no matter whether an emergency outlet extension is built or not.  The emergency outlet extension does *not* improve the ability of the facility to withstand seismic events.  Rather, its purpose is to prevent downstream flooding in the event an emergency release of water from Lake Perris is necessary (whether the emergency is caused by a seismic event, or

14

some other circumstance).  Again, even if the dam remediation were not performed, and the outlet tower were not constructed, a new emergency outlet extension would serve *its* primary purpose.  Paulek's assertion that the dam remediation and tower replacement "would not be constructed without the construction of the 'emergency outlet conveyance'" is simply unsupported by anything in the administrative record.

*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, is instructive.  In that case, the court of appeal considered an EIR for a refinery upgrade that would include a new hydrogen plant that, in addition to improving the refinery's own operations, would allow production of additional hydrogen, beyond that needed at the facility.  (*Communities for a Better Environment*, *supra*, at pp. 97-98.) The EIR did not consider as part of the same project a pipeline that would be needed to transport any such excess hydrogen off site; that was being considered in a separate CEQA process.  (*Communities for a Better Environment*, *supra*, at p. 97.)  The court of appeal found that treating the pipeline as a separate project for purposes of CEQA review did not constitute "illegal 'piecemealing,'" reasoning that the principal purpose of the refinery upgrade—to "'improve the [r]efinery's ability to process crude oil and other feed stocks'" was different from the principal purpose of the pipeline—"to transport excess hydrogen . . . to other hydrogen consumers . . . ." (*Communities for a Better Environment*, *supra*, at p. 101.)  Similarly, here, the principal purpose of the dam remediation and outlet tower reconstruction—to improve the ability of the Perris Lake facility itself to withstand seismic events—is different from, and does not depend on, the

15

functioning of the emergency outlet extension, the purpose of which is to transport water out of the lake and safely downstream from the dam, should it be necessary to do so.

The circumstance that the draft EIR for the "Perris Dam Remediation Program" described a three-part program, while the final EIR includes only two of those parts, is, contrary to Paulek's suggestion, immaterial to our analysis. Under CEQA, an agency may prepare one EIR for several similar projects that do not comprise a single larger project, or prepare one for each project, in its discretion. (Cal. Code Regs., tit. 14, § 15165.) The Department's initial decision to analyze each of the three proposed activities related to Lake Perris together in one draft EIR is not determinative, or even probative, of whether the emergency outlet extension is part of a single larger project that must be considered in a "single program EIR." (Cal. Code Regs., tit. 14, § 15165.)

Paulek's contention that the project was improperly segmented is rejected.

*4. The Department's responses to comments were adequate.*

Paulek contends that the Department's responses in the final EIR to comments submitted by the Friends of the Northern San Jacinto Valley—a July 2, 2007 letter regarding the notice of preparation, and an April 10, 2010, letter regarding the draft EIR, which makes reference to the first letter—are inadequate. We disagree; DWR's responses were sufficient.

After issuance of a draft EIR, "[t]he lead agency shall evaluate comments on environmental issues received from persons who reviewed the draft EIR and shall prepare a written response." (Cal. Code Regs., tit. 14, § 15088, subd. (a).) "Responses to comments need not be exhaustive; they need only demonstrate a 'good faith, reasoned

16

analysis.'" (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 937 (*Gilroy Citizens*); Cal. Code Regs., tit. 14, § 15088, subd. (c).) "'"'The determination of the sufficiency of the agency's responses to comments on the draft EIR turns upon the detail required in the responses. [Citation.] Where a general comment is made, a general response is sufficient.'"'" (*Gilroy Citizens*, *supra*, 140 Cal.App.4th at p. 937.) "Satisfactory responses to comments '"may be provided by reference to the EIR itself."'" (*Ibid.*)

First, the April 10, 2010, letter comments that the draft EIR ignores or gives "short shrift" to comments submitted in the July 2, 2007, letter.[8] It further asserts that the draft EIR "fails as a CEQA information document" in that it "does not provide the necessary information and analysis for the public, lead, responsible, and trustee agencies to make informed well reasoned decisions on this project." The Department's response in the final EIR is as follows: "The draft EIR adequately discusses the types and level of impacts this project will have on the environment." Paulek contends this response was legally inadequate.

The Department's response was sufficient. First, the Department had no obligation to respond to the July 2, 2007, letter. A response is required only with respect to comments "from persons who reviewed the draft EIR." (Cal. Code Regs., tit. 14, § 15088. subd. (a).) On July 2, 2007, there were no such persons, because the draft EIR had not been circulated. Second, the April 10, 2010, comment references the earlier

_____

[8] This portion of the letter is referred to as Comment 15A in DWR's responses.

17

letter, but provides no specific examples of how the draft EIR "fails as a CEQA information document," or what sort of "necessary information and analysis" was omitted from the draft EIR. As noted, a general comment requires only a general response. (*Gilroy Citizens*, *supra*, 140 Cal.App.4th at p. 937.)

Second, the April 10, 2010, letter states that it attaches a "1979 Mitigation Agreement," to which the Department was a party, so that it may be included in the administrative record. With respect to that agreement, the letter alleges that the draft EIR failed to analyze environmental impacts on lands beneath the dam, or to address the need for "wildlife mitigation replacement lands."[9] The Department's response acknowledges that the 1979 Mitigation Agreement will become a part of the administrative record, because all comments submitted become a part of the administrative record.[10] Additionally, the Department's response points to specific portions of the draft EIR analyzing permanent and temporary environmental impacts on lands beneath the dam. The response affirms that permanent environmental impacts will be mitigated as required, and notes that various other governmental agencies will have to be involved in identifying any necessary replacement lands.

Paulek complains that the Department's response is "completely devoid of any direct discussion of the [1979 Mitigation Agreement]" but points to no authority supporting the notion that such "direct discussion" was required. To the contrary, it is

_____

[9] These comments are referred to as Comment 15B in the Department's responses.

[10] The 1979 Mitigation Agreement is included in the administrative record, as stated in the Department's response.

18

perfectly appropriate for the Department to provide a response by reference to the portions of the draft EIR in which the environmental impacts raised by the comment are analyzed. (*Gilroy Citizens*, *supra*, 140 Cal.App.4th at p. 937.) Paulek further complains that the response does not "describe the disposition of the significant environmental issues raised," apparently demanding a complete accounting of what specific parcels will be used as replacement for any land permanently impacted by the projects. But the response adequately explains that approval of various other public agencies will be necessary before such identification could be accomplished, and affirms the Department's intention to fully comply with applicable mitigation requirements. We conclude the Department's response fully complies with CEQA's requirement to demonstrate good faith, reasoned analysis.

Paulek's reliance on *The Flanders Foundation v. City of Carmel-by-the-Sea* (2012) 202 Cal.App.4th 603, is misplaced. In that case, a comment proposed specific mitigation measures, and the agency involved failed to provide any response to the suggestion. (*Id.* at pp. 615-616.) Here, the Department did respond to the comment at issue by pointing to the portions of the draft EIR that perform the analysis demanded, and affirming the Department's intention to comply with the mitigation requirements referenced. Paulek additionally cites *Katzeff v. California Deptartment of Forestry & Fire Protection* (2010) 181 Cal.App.4th 601, 614, for the proposition that " . . . where a public agency has adopted a mitigation measure for a project, it may not authorize destruction or cancellation of the mitigation . . . without reviewing the continuing need for the mitigation, stating a reason for its actions, and supporting it with substantial

19

evidence.'" But it is not apparent what this proposition has to do with the proverbial price of tea in China. Nothing in the Department's response, or anywhere else in the administrative record, suggests that the Department has authorized or contemplates "destruction or cancellation" of any mitigation measure.

The April 10, 2010, letter further attaches a Department of Fish and Game authorization implementing the "Stephens' Kangaroo Rat Habitat Conservation Plan (SKR HCP), and requests its inclusion in the administrative record. It also cites various provisions of law related to the SKR HCP, including the role of the Riverside County Habitat Conservation Agency (RCHCA) regarding the Stephens' kangaroo rat under California's Endangered Species Act, and requirements for mitigation of "incidental take" of endangered species generally.[11] The Department's response points to portions of the draft EIR discussing the Stephens' kangaroo rat and the SKR HCP, acknowledges that RCHCA approval will be needed for any impacts within the area governed by the SKR HCP, and cites to a mitigation measure requiring the Department to comply with the requirements of the SKR HCP.[12]

Again, the rule that a general comment requires only a general response applies. Paulek fails to identify specifically any manner in which this response is deficient, and we can discern none.

---

[11] These comments are referred to as Comment 15C in the Department's responses.

[12] The authorization regarding the SKR HCP is included in the administrative record, as Paulek had requested.

20

The April 10, 2010, letter further asserts that the "Draft EIR fails to properly qualify and quantify the incidental take this project will precipitate on the endangered [Stephens' kangaroo rat]," and fails to fully minimize or mitigate such incidental take, or to conduct an analysis of the cumulative impact of the proposed activity together with other past and reasonably foreseeable future activities.[13] The Department's response points to its analysis in the draft EIR with respect to potential impacts on biological resources, explicitly including analysis of impacts on the Stephens' kangaroo rat, and including a detailed cumulative impact analysis. The response further points to surveys conducted and included in the administrative record that found no Stephens' kangaroo rats would be directly impacted by the project, because none were located in project areas, and the areas anticipated to be impacted by the projects have not been identified as historically occupied by the Stephens' kangaroo rat. The response also refers to discussion in the EIR of mitigation measures adopted with respect to any potential impacts, and acknowledges again that compliance with the SKR HCP would be required, including approvals from the RCHCA for any temporary or permanent impacts to grasslands.

Paulek asserts that this response is overly general and fails to respond in detail to the "significant environmental issues" raised by the comments. Again, however, response by reference to the draft EIR itself is permissible. (*Gilroy Citizens*, *supra*, 140 Cal.App.4th at p. 937.) Paulek provides no cogent analysis as to why the referenced

---

**13** These comments are referred to as Comment 15D in the Department's responses.

sections of the draft EIR are not responsive to the comments. For example, Paulek insists that the Department's "failure to address the cumulative impact of taking SKR habitat within the SKR reserve is particularly egregious." He fails to articulate, however, any reason why the cumulative impact analysis that *is* in the draft EIR—the comment's false assertion of a complete lack of such analysis notwithstanding—does not suffice. And he ignores entirely the circumstance that CEQA does not require exhaustive analysis of cumulative impacts. (Cal. Code Regs., tit. 14, § 15130, subd. (b) ["The discussion of cumulative impacts shall reflect the severity of the impacts and their likelihood of occurrence, but the discussion need not provide as great detail as is provided for the effects attributable to the project alone."] Further, the response acknowledges that the Department would be required to comply with the SKR HCP and obtain the approvals required under that conservation plan, which was specifically designed to facilitate preservation and management of habitat occupied the Stephens' kangaroo rat within a large area encompassing multiple developments.[14] (See *Banning Ranch*, *supra*, 211 Cal.App.4th at p. 1231 [discussing purpose of conservation plan].)

In sum, Paulek has failed to meet his burden of showing the Department's responses to written comments regarding the draft EIR to be inadequate.

---

[14] To the extent Paulek may suggest compliance with the SKR HCP is insufficient to protect the Stephens' kangaroo rat, that is a matter beyond the scope of this action, and should have been raised during proceedings regarding the adoption of the SKR HCP.

## III.  DISPOSITION

The judgment appealed from is affirmed.  Defendant and Respondent California Department of Water Resources shall recover its costs on appeal.

CERTIFIED FOR PUBLICATION.


_____HOLLENHORST_____
Acting P. J.

We concur:

_____KING_____
J.

_____CODRINGTON_____
J.

23