Filed 11/30/17  Certified for Publication 12/22/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LOS ANGELES CONSERVANCY,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>CITY OF WEST HOLLYWOOD<br>et al.,<br><br>      Defendants and Respondents;<br><br>CHARLES COMPANY et al.,<br><br>      Real Parties in Interest and<br>      Respondents. | B270158<br><br>(Los Angeles County<br>Super. Ct. No. BS151056) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge.  Affirmed.

Brandt-Hawley Law Group, Susan Brandt-Hawley, and Skyla V. Olds for Plaintiff and Appellant.

Jenkins & Hogin, Michael Jenkins, City of West Hollywood City Attorney, John C. Cotti, and Lauren Langer for Defendant and Respondent.

Truman & Elliott, Kathleen O'Prey Truman, Todd Elliott, and Russell E. Morse for Real Parties in Interest and Respondents.

Los Angeles Conservancy (Conservancy) petitioned the superior court for a writ of mandate to compel the City of West Hollywood (the City) to set aside the City's approval of a real estate development project known as "the Melrose Triangle" project. The Conservancy argues that the environmental impact report (EIR) was flawed in its analysis of alternatives to the project, the City failed to respond to public comments, and the City's finding that a particular alternative to the project is infeasible is not supported by substantial evidence. The trial court denied the petition, and the Conservancy appealed. We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

Real parties in interest Charles Company and System, LLC, applied to the City for permits to develop a three-acre triangular site bound by Santa Monica Boulevard, Melrose Avenue, and Almont Drive. The site, adjacent to the City's western boundary and known as "the Melrose Triangle," includes a building located at 9080 Santa Monica Boulevard (the 9080 Building). The 9080 Building was built in 1928 and remodeled in 1938 based on designs by the architectural firm of Wurdeman and Becket, "notable Los Angeles architects whose works included . . . many important examples of Mid-Century Modern architecture." The building may be eligible for listing on the California Register of Historical Resources.

In 2012, the City amended its general plan to provide certain development incentives for the Melrose Triangle site. The incentives were intended to encourage "exemplary architectural design elements, with a significant portion of open space maintained as pedestrian walk-throughs open to the sky." The City desired "an iconic 'Gateway' building, welcoming visitors, residents, and passersby to the City of West Hollywood."

2

The real parties in interest's development plans called for the demolition of existing buildings, including the 9080 Building, and the construction of three buildings and a pedestrian paseo between the buildings connecting Santa Monica Boulevard and Melrose Avenue.  The proposed buildings include 137,064 square feet of office space, 82,021 square feet of space for retail and restaurant use, 76 residential units, and 884 parking spaces on four subterranean levels.  The plan also provided for 6,985 square feet of "private open space" and 9,463 square feet of "common open space."

The most prominent of the proposed buildings is the "The Gateway Building," which would be built at the point where Santa Monica Boulevard, Melrose Avenue, and Doheny Drive meet.  The Gateway Building would occupy the space currently taken up by the 9080 Building.  A second building—"the Boulevard Building"—will front Santa Monica Boulevard and Almont Drive. "The Avenue Buildings" will be located at the corner of Almont Drive and Melrose Avenue.  There would be an internal courtyard and pedestrian paseo connecting Santa Monica Boulevard and Melrose Avenue.

The City prepared a draft EIR pursuant to the California Environmental Quality Act (CEQA) and circulated it for public review and comment in 2014.  The EIR identified the demolition of the 9080 Building as a "significant and unavoidable" adverse impact of the project.  To address that impact it described three alternatives to the project.  The first—a "No Project/No New Development" alternative—would make no changes on the project site.  The second alternative provided for a reduction of office space to approximately 102,000 square feet.  The third alternative (Alternative 3) would preserve the 9080 Building by reducing and redesigning the project.  Only Alternative 3 is relevant in this appeal.

According to the EIR, Alternative 3 would provide for retail, office, and residential uses, but would require the project be "reduced and redesigned in order to retain the [9080 Building]." The alternative would reduce retail and restaurant space from 82,021 square feet to 60,400 square feet, and office space from 137,064 square feet to 86,571 square feet. Residential space and shared space would remain the same.

The EIR discusses the impacts of Alternative 3 on the area's aesthetics, air quality, biological resources, cultural resources, geology, climate change, hazards and hazardous materials, hydrology and water quality, land use, noise, population and housing, public services and utilities, recreation, and traffic. It includes a matrix summarizing and comparing the impacts of the project and each alternative for each category.

The EIR states that Alternative 3 would be environmentally superior to the project because it would not require demolition of the 9080 Building and would impact traffic less. The EIR concludes that Alternative 3 "would achieve many of the project objectives but would not utilize the existing parcels to their full extent. Although Alternative 3 would avoid the [loss of the 9080 Building], the reduction of retail and office uses may not maximize the redevelopment potential of the site or fully enhance the area's overall urban character. In addition, Alternative 3 would not result in a cohesive site design and would not create a unified gateway design for the project site, which is the western gateway to the City of West Hollywood. Consequently, Alternative 3 would not expand the economic base of the City or foster the City's fiscal health to the same degree as the proposed project. In addition, this [a]lternative would not result in a cohesive site design and would not enhance the intersection of Santa Monica Boulevard/Melrose Avenue/Doheny Drive to create a unified design for the western gateway to the City of West Hollywood. Therefore, this

4

[a]lternative would meet some of the project objectives, but not to the same degree as the proposed project."

The EIR also identifies two actions that would mitigate the impact of demolishing the 9080 Building:  (1) the building's exterior and "character-defining features" would be photographed for preservation by the City's Historic Preservation Commission and a pamphlet would be created that discusses the general history of the project area and the "Streamline Moderne Style"; and (2) the project would be modified to "incorporate some of the character-defining features of the "Streamline Moderne Style" into the design.

The City received 16 comments to the draft EIR, three of which expressed opposition to the demolition of the 9080 Building. The comments and the City's responses, which we discuss below, are included in the final EIR.

In June 2014, the City's Planning Commission recommended approval of the project.  The following month, before the city council's meeting to consider the project, the real parties in interest requested that its architects consider revising the project to either (1) include the 9080 Building at its present location, (2) move the building to another location on the project site, or (3) integrate into the project design portions of the building.

The architects concluded that preserving the 9080 Building in its present location "would have significant negative impacts to the overall project design, requiring redesign of the project's subterranean parking facility causing a loss of required parking and . . . require an entire redesign of the Gateway Building." The architects stated that the second possibility—moving the 9080 Building to another location on the site—would not only "require a significant redesign of the project impacting the entire character of the site," but also "destroy the integrity of the historic

5

resource and likely impact its eligibility of listing as a historic resource."

Regarding the third possibility, the architects prepared a design that would incorporate the entry façade of the 9080 Building as the main entrance to the Gateway Building offices from the pedestrian paseo and establish a kiosk near the entrance containing information regarding the 9080 Building.

In August 2014, the City certified the EIR, adopted the mitigation measures described above, imposed a development condition requiring integration of the 9080 Building façade into an entrance to the Gateway Building, and adopted a statement of overriding considerations.

In the statement of overriding considerations, the City stated that the project as designed "captured" the City's desire for "an iconic 'Gateway' " to the City that "will effectively communicate the transition into" the City. Alternative 3, the City found, is "infeasible as an alternative or a mitigation measure because it is inconsistent with the project objectives. While Alternative 3 would allow for the proposed mix of uses, this alternative would eliminate and disrupt the project's critical design elements." "Designing the project around the [9080 B]uilding," the City explained, "would result in an interrupted design frontage along Santa Monica Boulevard" and "would necessitate construction of smaller, disjointed structures on the site to accommodate the existing building."

In November 2014, the Conservancy filed in the superior court the operative first amended petition for writ of mandamus. The Conservancy argued that the EIR's analysis of Alternative 3 was inadequate, the EIR failed to respond to public comments, and

the City's finding that Alternative 3 is infeasible is not supported by substantial evidence.[1]

The trial court denied the petition in January 2016. The Conservancy timely appealed.

## DISCUSSION

### I.      Standards of Review

We review de novo the superior court's denial of a petition for writ of administrative mandate challenging the adequacy of the EIR. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.) We review the public agency's underlying decision to determine whether the agency abused its discretion. (Pub. Resources Code, § 21168; Code Civ. Proc., § 1094.5, subd. (b); *Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 467.) An abuse of discretion in this context means that the agency failed to proceed in a manner required by law, the agency's decisions are not supported by its findings, or the agency's findings are not supported

---

[1] On May 20, 2015, while the mandate proceeding was pending, the 9080 Building was damaged in a fire. According to a damage assessment report prepared for the City, approximately 25 percent of the building floor area was damaged beyond repair and requires demolition and removal. The report concluded that the "[b]uilding is an unsafe and substandard building due to partial collapse of the roof and floor structures in the southwestern portion of the building, extensive damage in adjacent roofs, beams, floors and walls and damaged electrical, mechanical and plumbing components. As such, the current state of the fire damaged building constitutes a public nuisance." "[D]emolition [was] the favored economic alternative over rehabilitation." The existing façade along Santa Monica Boulevard, however, could "be preserved and/or salvaged for later reuse." None of the parties assert that the fire should have any effect on our analysis of the issues.

by substantial evidence.  (Code Civ. Proc., § 1094.5, subd. (b); *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 674.)

## II.    The EIR's Analysis of Alternatives

The Conservancy contends that the EIR's analysis of alternatives to the project is inadequate.  Specifically, the Conservancy contends that the analysis of Alternative 3 is "conclusory and insufficient."  We disagree.

A project that involves the destruction of a building that is eligible for listing in the California Register of Historical Resources will have "a significant effect on the environment" for purposes of CEQA.  (Pub. Resources Code, § 21084.1; see *Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336, 1352-1353 (*Preservation Action*).)  An EIR for such a project must consider and discuss feasible alternatives that would avoid or lessen any significant adverse environmental impact.  (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 123; Pub. Resources Code, § 21100, subd. (b)(4); Cal. Code Regs., tit. 14 (Guidelines), § 15126.6.)  The discussion of alternatives "must be specific enough to permit informed decision making and public participation."  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 406 (*Laurel Heights*).)  The "level of analysis is subject to a rule of reason," and the EIR need not " 'consider in detail each and every conceivable variation of the alternatives stated.' "  (*Id.* at p. 407.)

The Conservancy points out that the EIR does not include a "conceptual design of Alternative 3."  That is true; there are no architectural drawings of an alternative plan that includes the retention of the 9080 Building.  The Conservancy does not, however, cite any legal authority requiring an EIR to include design plans for project alternatives, and we decline to so hold.

8

The Conservancy also faults the EIR for stating that retaining the 9080 Building would "preclude construction of the Gateway Building and a portion of the Avenue Buildings" without providing any explanation. No explicit explanation, however, is necessary. It appears from the plans and drawings of the project included in the EIR that the Gateway Building will be built where the 9080 Building is currently located. Two buildings cannot coexist at the same time in the same spot; if the 9080 Building remains, the Gateway Building cannot be constructed without substantial change in the design. "While some conclusions may require an extended analysis to justify them, others are so simple they are almost self-explanatory." (*Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745, 1754.) The challenged statement is in the latter category, and the self-explanatory designs adequately demonstrate that retaining the 9080 Building would preclude construction of, at least, the Gateway Building.

The Conservancy challenges the EIR's use of estimates in calculating the reduction in usable square footage. It relies on *Preservation Action, supra*, 141 Cal.App.4th 1336. In that case, an EIR analyzed a project to build a 162,000-square-foot Lowe's retail warehouse that would involve the demolition of a building deemed a "significant historic resource." (*Id.* at p. 1342.) The 162,000-square-foot building had 116,000 square feet of sales floor space. (*Id.* at p. 1347.) The EIR discussed a "reduced-size alternative" that would retain the historic building and allow the development of a 94,000-square-foot building, a size that Lowe's considered infeasible. The Court of Appeal concluded that this 94,000 number was ambiguous because it was not clear whether it referred to the size of the entire store or only the store's sales floor. (*Id.* at p. 1355.) If the number referred to the sales floor only, it was possible that the size of the entire store would be large enough

9

to make the warehouse feasible. The ambiguity thus made it "impossible to determine" how the alternative compared with the developer's plans or to evaluate its feasibility, and "meant that the public and the [c]ity [c]ouncil were not properly informed of the requisite facts that would permit them to evaluate the feasibility of this alternative." (*Ibid.*)

There is no analogous ambiguity in the instant case. In *Preservation Action*, the 94,000-square-foot number had two possible meanings, one of which might have rendered the alternative feasible and the other infeasible. The EIR in that case thus failed as an informative document and needed to be clarified. Here, although the estimates regarding the reduction of retail, restaurant, and office space that would occur under Alternative 3 may have been imprecise, there is no confusion about their meaning; apples were being compared to apples.

The imprecision inherent in the estimates of space reduction does not render the EIR defective because " '[a]bsolute perfection' " in the analysis of alternatives " 'is not required; what is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned.' " (*Laurel Heights*, *supra*, 47 Cal.3d at pp. 406-407.) The discussion of alternatives in the EIR satisfies this requirement.

### III.   The EIR's Response to Comments

The Conservancy next contends that the EIR failed to respond adequately to public comments to the draft EIR. We disagree.

After the designated lead agency makes a draft EIR available to the public, the public may comment on the draft. (Pub. Resources Code, § 21091, subd. (a).) The lead agency must evaluate and respond to timely comments relating to significant environmental issues, and include the comments and responses in the final EIR. (*Laurel Heights Improvement Assn. v. Regents of*

10

*University of California* (1993) 6 Cal.4th 1112, 1124; Pub. Resources Code, § 21091, subd. (a); Guidelines, § 15088.)  The agency's response must "demonstrate a 'good faith, reasoned analysis,' " but "need not be exhaustive." (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 937.)  The response "can be sufficient if it refers to parts of the draft EIR that analyzes the environmental impacts raised by the comment." (*City of Irvine v. County of Orange* (2015) 238 Cal.App.4th 526, 550; see also *Paulek v. Department of Water Resources* (2014) 231 Cal.App.4th 35, 48.)  Furthermore, general comments can be met with general responses, and "comments that are only objections to the merits of the project itself may be addressed with cursory responses." (*City of Irvine v. County of Orange*, *supra*, 238 Cal.App.4th at pp. 550, 553.)

The Conservancy refers us to two comments.  In one, the West Hollywood Preservation Alliance expressed opposition to the demolition of the 9080 Building and stated its view "that this building could be restored and adaptively reused to retain its character defining features and thereby provide a creative and engaging development for the citizens of West Hollywood."  In the second, the President of the Art Deco Society of Los Angeles supported Alternative 3 and stated his "belie[f] that a thoughtful design of the Melrose Triangle project that includes an adaptive reuse of the 9080 [B]uilding that is carefully incorporated into the overall project will result in a superior site design that will enhance the cultural life of the City of West Hollywood."

The City responded to these comments by referencing the discussion of Alternative 3 in the EIR, and stating:  " 'Alternative 3 would not result in a cohesive site design and would not create a unified gateway design for the project site, which is the western gateway to the City of West Hollywood.' . . . [B]ecause the [9080 Building] is located in the center of the project site fronting Santa Monica Boulevard, designing the proposed project around

11

the building would result in an interrupted design frontage along Santa Monica Boulevard and would necessitate construction of smaller, disjointed structures on the site.  In addition, the provision of adequate parking could be significantly hampered by the need to avoid construction near or below the building when constructing the subterranean parking garage.  Finally, the provision of a wide pedestrian paseo through the site would not be easily achieved, thereby reducing the pedestrian access and walkability of the site. The modern architectural style of the proposed project would not be cohesive if the [9080 Building] was preserved on the site."[2]

The comments the Conservancy relies upon consist of objections and general expressions of support for Alternative 3. The comments do not raise new issues or disclose any analytical gap in the EIR's analysis.  The City could therefore respond, as it did, by referencing the EIR's discussion of the issues concerning the 9080 Building and Alternative 3 and providing a brief, general response.  (See *City of Irvine v. County of Orange, supra,* 238 Cal.App.4th at p. 550.)

## IV. Sufficiency of the Evidence to Support the Finding of Infeasibility of Alternative 3

A public agency may approve a project that will have a significant effect on the environment if the agency finds that: (1) "specific economic, legal, social, technological, or other considerations . . . make infeasible the mitigation measures or alternatives identified in the [EIR]," and (2) the significant effects on the environment are outweighed by "specific overriding

---

[2] The City's response to the president of the Art Deco Society of Los Angeles is identical to the response to the West Hollywood Preservation Alliance with the exception that the response to the president of the Art Deco Society of Los Angeles refers to the "proposed project," rather than the "project."

12

economic, legal, social, technological, or other benefits of the project." (Pub. Resources Code, § 21081, subds. (a)(3) & (b); see *No Slo Transit, Inc. v. City of Long Beach* (1987) 197 Cal.App.3d 241, 257.)

The Conservancy argues that the evidence is insufficient to support the City's finding that Alternative 3 is infeasible. We reject the contention.

In the context of project approval, a public agency may find that an alternative is "infeasible" if it determines, based upon the balancing of the statutory factors, that an alternative cannot meet project objectives or " 'is impractical or undesirable from a policy standpoint.' " (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 1001 (*California Native Plant Society*); see also *Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 948-949 (*Rialto Citizens for Responsible Growth*); *City of Del Mar v. City of San Diego* (1982) 133 Cal.App.3d 401, 417.)

An agency's finding of infeasibility for this purpose is "entitled to great deference" and " 'presumed correct.' " (*California Native Plant Society*, *supra*, 177 Cal.App.4th at p. 997.) The finding must, however, be supported by substantial evidence. (*Ibid.*; Guidelines, § 15091, subd. (b).) The Guidelines define substantial evidence as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) Evidence to support the City's findings may be contained anywhere in the administrative record. (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco*, *supra*, 102 Cal.App.4th at p. 690; *California Native Plant Society*, *supra*, 177 Cal.App.4th at p. 1003.)

13

In approving the project and the statement of overriding considerations, the City found that Alternative 3 "was inconsistent with the project objectives," including the following:

"2.  Provide a modern, high-quality design that complements surrounding uses and contributes to a sense of community, yet stands as an architectural gateway to the City";

"5.  Create a consistent pattern of development and uses along Santa Monica Boulevard that serves project residents and the surrounding community by redeveloping an underutilized site";

"8.  Enhance the intersection of Santa Monica Boulevard, Melrose Avenue, and Doheny Drive so that it may serve as a recognizable entrance to the City through:  [¶] the location, form, and architectural elements of structures; [¶] landscaped open spaces; [¶] public art and/or other appropriate design techniques";

"9.  Develop and encourage pedestrian-oriented uses, making the area more pedestrian friendly"; and

"14.  Provide adequate common open space and internal access within the project site to meet the needs of the proposed uses and users."

The issue, therefore, is whether there is enough information in the record to support a fair argument that Alternative 3 was inconsistent with these objectives.  (See *Rialto Citizens for Responsible Growth*, *supra*, 208 Cal.App.4th at p. 949; 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2011) § 17.30, pp. 17-30—17-31.)

The project development plans and photographs in the EIR show that the 9080 Building is strikingly dissimilar in appearance compared to the other buildings planned for the site.  Even if retaining the 9080 Building as part of the project is feasible as an engineering matter, fair arguments can be made that its architectural style is neither "modern" nor "consistent" with the pattern of development along Santa Monica Boulevard.  Although

14

the Conservancy argues that a "modern" design "often includes historic elements" and the 9080 Building can still satisfy the "consistent pattern" requirement, these are, at best, merely "other conclusions [that] might also be reached" (Guidelines, § 15384, subd. (a)); they do not negate the fairness of arguments supporting the City's conclusion.

The same evidence also supports fair arguments that Alternative 3 would not "[e]nhance the intersection" at the City's "Gateway," as provided in objective No. 8. This finding is further supported by testimony from an architect involved in the project that incorporating the 9080 Building into the project "compromise[d] the ability to create . . . a more iconic really strong gateway element into the City," and the EIR's conclusion that "Alternative 3 would not enhance the Santa Monica Boulevard Corridor to the same degree as the proposed project since there would not be a cohesive site design for the entire project site."

The City's finding that Alternative 3 is inconsistent with the objectives to encourage pedestrian-oriented uses, make the area "more pedestrian friendly," and provide "internal access within the project site" is supported by the statement in the EIR that Alternative 3 would preclude "pedestrian connectivity through the site." The finding is further supported by testimony from a "Senior Planner" for the City that "the required pedestrian paseo . . . would prevent redesign of the project to incorporate the [9080 B]uilding."

There is, therefore, substantial evidence to support the City's finding that Alternative 3 is infeasible.

## DISPOSITION

The judgment is affirmed.  Respondents Charles Company and System, LLC and respondent City of West Hollywood are awarded their costs on appeal.

ROTHSCHILD, P. J.

We concur:

JOHNSON, J.

LUI, J.

16

# CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LOS ANGELES CONSERVANCY, | B270158 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS151056) |
| v. | |
| CITY OF WEST HOLLYWOOD et al., | CERTIFICATION AND ORDER FOR PUBLICATION |
| Defendants and Respondents; | |
| CHARLES COMPANY et al., | |
| Real Parties in Interest and Respondents. | |

THE COURT:

      The opinion in the above-entitled matter filed on November 30, 2017, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

ROTHSCHILD, P. J.      JOHNSON, J.      LUI, J.