Filed 12/27/24  Ballona Ecosystem etc. v. Dept. of Fish & Wildlife CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| BALLONA ECOSYSTEM EDUCATION PROJECT, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE, <br><br> Defendant and Respondent. | B331193 <br><br> (Los Angeles County Super. Ct. No. 21STCV03657) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

Law Office of Todd T. Cardiff and Todd T. Cardiff for Plaintiff and Appellant.

Rob Bonta, Attorney General, Tracy L. Winsor, Senior Assistant Attorney General, Gary E. Tavetian, Supervising

Deputy Attorney General, and John S. Sasaki, Deputy Attorney General, for Defendant and Respondent.

## INTRODUCTION

This action is a challenge under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) to the California Department of Fish and Wildlife's certification of a project to enhance and establish certain habitats in the Ballona wetlands ecosystem in Los Angeles County. Ballona Ecosystem Education Project, a nonprofit environmental organization (the Organization), argues the Department's environmental impact report (EIR) for the project was deficient in numerous respects. We conclude the EIR met the requirements under CEQA to describe the project and a reasonable range of alternatives to the proposed action and to provide detail sufficient for the public to understand and comment on the project. We also conclude the Department sufficiently addressed and responded to comments concerning potential short- and long-term impacts to the protected white-tailed kite. Therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Ballona Wetlands Ecological Reserve*

The Ballona wetlands ecosystem once spanned more than 2,100 acres that stretched from Playa del Rey to Venice and inland to Baldwin Hills and that supported diverse wetland habitats. Over time commercial development destroyed or degraded much of that wetland habitat. In the 1930's the United States Army Corps of Engineers (the Corps) constructed the

2

Ballona Creek flood risk management channel and confined Ballona Creek, which runs through the center of the ecosystem, to a concrete-sided channel that flows into the Pacific Ocean. In the 1950's developers of Marina del Rey dumped approximately 3 million cubic yards of dredged material in the Ballona Reserve, burying many acres of wetland habitat.

In 2005 the State of California declared the remaining wetlands ecosystem an ecological reserve to protect native plants, wildlife, and specialized habitat types. (See Fish & G. Code, § 1580; Cal. Code Regs., tit. 14, § 15000 (CEQA Guidelines).)[1] The Ballona Reserve now consists of 566 acres south of Marina del Rey and east of Playa del Rey. The Department manages the land within the Ballona Reserve with the exception of the Ballona Creek channel and levee system, over which the Corps and the Los Angeles County Flood Control District have jurisdiction. In general, the Department is "the State's trustee for fish and wildlife resources with jurisdiction over the conservation, protection, and management of fish, wildlife, native plants, and habitat necessary for biologically sustainable populations of those species."

In 2012 the United States Environmental Protection Agency determined all wetland habitats within the Ballona

---

[1] "'CEQA Guidelines' refers to the regulations codified in title 14, section 15000 et seq. of the California Code of Regulations, which have been 'prescribed by the Secretary for Resources to be followed by all state and local agencies in California in the implementation of [CEQA].'" (*California Natural Gas Vehicle Coalition v. State Air Resources Bd.* (2024) 105 Cal.App.5th 304, 322, fn. 3; see CEQA Guidelines, § 15000; see also *Planning & Conservation League v. Department of Water Resources* (2024) 98 Cal.App.5th 726, 749, fn. 9.)

Reserve were "impaired." Invasive, nonnative plants were crowding out native plants and providing less support for native wildlife. With few exceptions, the general public may not enter the Ballona Reserve without authorization from the Department.

B. *The Department Certifies a Final Environmental Impact Report for the Project*

In September 2017 the Department issued a draft EIR for public review and comment on a project called the "Restoration of the Ballona Reserve" (the Project).[2] The draft EIR described the Project as "a large-scale restoration of the Ballona Reserve that would entail restoring, enhancing, and establishing native coastal wetland and upland habitats within the Ballona Reserve."[3] The objectives of the Project include (1) establishing "estuarine and associated habitats"[4] that support multiple

---

[2] According to the Department, it prepared a joint draft EIR with the Corps because certain aspects of the Project, such as modifications to the Ballona Creek channel and levees, require Corps approval. Thus, the draft EIR addresses requirements under both CEQA and the federal National Environmental Policy Act. After the Department released the draft EIR for public comment, the Corps informed the Department it would delay its final environmental impact statement because of changes in federal policies. Rather than wait for the Corps, the Department issued a final EIR for compliance under CEQA only.

[3] Upland habitats are areas bordering aquatic and riparian habitats. (*Center for Sierra Nevada Conservation v. U.S. Forest Service* (E.D.Cal. 2011) 832 F.Supp.2d 1138, 1176, fn. 42.)

[4] Estuarine habitats are "'coastal complexes where fresh water from the land meets the salt water of the sea with a daily tidal flux.'" (*State v. Brooks* (1969) 275 N.C. 175, 178; see Note:

habitat types and are "self-sustaining" by adapting to sea level rise and requiring minimal "active management"; (2) "improving tidal circulation into the wetlands to enlarge the amount of area that is tidally inundated . . . and creating dynamic hydrologic interactions between the Ballona Creek channel, wetlands within the Ballona Reserve, and the Santa Monica Bay"; and (3) developing public access for recreation and educational activities.

The draft EIR described and analyzed three alternatives that would implement the Project to varying degrees, as well as a "no project" alternative. Each alternative would impact three areas of the Ballona Reserve described in the EIR differently. Area A is a mostly undeveloped tract of 156 acres north of Ballona Creek where dredged material was dumped in the mid-20th century. It is now predominantly upland habitat. Area B is 335 acres south of Ballona Creek; it includes a freshwater marsh that would not be affected by the Project. Area C is 69 acres adjacent to Area A, north of Ballona Creek and east of Lincoln Boulevard; it includes monitoring wells and associated pipelines owned by Southern California Gas Company, as well as baseball fields used by the public.

The draft EIR identified Alternative 1, "Full Tidal Restoration/Proposed Action," as the "Proposed Action." The EIR proposed implementing Alternative 1 in two phases. During Phase 1 the concrete levees on a portion of Ballona Creek would be removed, Ballona Creek would be "realigned to flow in a more natural meander-shaped pattern," and portions of Areas A and C

_____

Corporate Welfare?: State Tax Incentives for Air Pollution Control (2003) 35 Conn. L.Rev. 1717, 1738, fn. 141 ["'Estuarine' is the area where the current of a river meets the ocean tides."].)

would be lowered by removing the existing fill to create a "connected floodplain."  Phase 2 would affect primarily Area B, where the remaining portions of the levees would be lowered to create a full tidal wetland, removed fill would be used to build new earthen levees and berms,[5] and parts of Area B would be regraded to establish upland habitat.  To implement Alternative 1, over 2 million cubic yards of fill would be removed primarily from Area A and used to create the new levees and berms, as well as "transition zones" and "upland restoration areas" to allow Ballona Creek "to reconnect with its historic floodplain."

The draft EIR stated that, following implementation of Alternative 1, the Project would (1) establish 81 acres of new, and enhance 105.8 acres of existing, native wetlands; (2) establish 38.7 acres of new, and enhance 58 acres of existing, non-wetlands; (3) subject 31.4 acres of wetlands to permanent loss and 30.2 acres to temporary impacts; and (4) subject 5.2 acres of non-wetlands to permanent loss and 25 acres to temporary impacts.  In sum, Alternative 1 would create 246.9 acres of new or enhanced habitat and temporarily impact 55.2 acres of wetlands and non-wetlands.  New or enhanced habitats would include "tidal wetland, brackish marsh, salt pan, dune, annual grassland, transitional, upland scrub, and riparian scrub." Alternative 1 would also create new hiking trails, bike trails, and

---

[5]     "A berm is an earthen or concrete wall which prevents discharges." (*Sultany Trucking, LLC v. Missouri Clean Water Com.* (Mo.Ct.App. 2023) 662 S.W.3d 775, 779.)  It is also "a 'flat strip of land, raised bank, or terrace bordering a river or canal; a path or grass strip beside a road; an artificial ridge or embankment . . . .'" (*Hartford Fire Ins. Co. v. Gandy Dancer, LLC* (D.N.M. 2013) 981 F.Supp.2d 981, 989, fn. 6.)

bridges for pedestrians and bikes and open the Ballona Reserve to certain recreational and educational uses.

Alternatives 2 and 3, which the draft EIR ultimately rejected for various reasons, would have a smaller impact on existing habitats. For example, Alternative 2 would remove less area of the concrete levees and leave habitats in certain parts of Area B intact. Alternative 3 would focus primarily on Areas A and C and would not remove any portion of the existing levees. Instead, the Department would install new water control structures to support tidal circulation in Area A.

The draft EIR also identified and analyzed potential environmental impacts caused by each alternative the Department considered. And the draft EIR identified measures to avoid or reduce potentially significant environmental impacts caused by Alternative 1. In particular, the draft EIR identified potentially significant impacts Alternative 1 may have on special-status plants, habitats, and wildlife, and it identified mitigation measures for each such impact.

The Department received over 8,000 comments on the draft EIR. In December 2019 the Department issued a final EIR, including over 4,000 pages of responses to those comments and revisions to the draft EIR. The Department certified the EIR on December 30, 2020.

C. *The Trial Court Grants in Part and Denies in Part the Organization's Petition for a Writ of Mandate Challenging the Project's Certification*

In January 2021 the Organization, along with another nonprofit organization called Grassroots Coalition, filed a petition for writ of mandate challenging the Department's certification of

the Project under CEQA.  The Organization made various arguments, including (1) the Project's description was misleading; (2) the EIR failed to consider a reasonable range of alternatives, such as a "freshwater/brackish water marsh alternative"; (3) the EIR failed to include a vegetation map showing where specific types of vegetation would be cultivated; (4) the EIR failed to properly study and analyze, and improperly deferred, mitigation of certain impacts to habitat and wildlife; (5) the EIR failed to adequately address certain environmental impacts to special status wildlife species, including the white-tailed kite; and (6) substantial evidence did not support the Department's findings there were no significant unmitigable environmental impacts.  In particular, the Organization argued the Project's description was misleading by referring to the Project as a "restoration" and by failing to include the correct flood control design standard.

The trial court rejected the Organization's arguments, with the exception of the contention that the Project description failed to include the correct flood control design standard and that, as a result, the EIR failed to analyze the wildlife and habitat impacts of a levee design consistent with the correct standard.  The trial court also ruled the Department violated CEQA "by authorizing material changes to [the EIR's performance criteria] without a framework for approval or future supplemental environmental review."  The court, however, stated "this defect can be easily rectified by a commitment to additional environmental review." Thus, the trial court granted the Organization's petition in part and issued a writ directing the Department to set aside the final EIR and approval of the Project and prepare and certify a legally

8

adequate EIR if the Department chose to proceed with the Project.

The trial court entered judgment, and the Organization timely appealed. Grassroots Coalition and the Department did not appeal.

## DISCUSSION

A. *Applicable Law and Standard of Review*

CEQA ensures "public agencies will consider the environmental consequences of discretionary projects they propose to carry out or approve." (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 488; see *County of Butte v. Department of Water Resources* (2023) 90 Cal.App.5th 147, 157-158 (*County of Butte*).) "To that end, absent an exemption, an agency proposing to carry out or approve a project generally must conduct an initial study to determine 'if the project may have a significant effect on the environment.' [Citation.] 'If, after performing an initial study, the agency responsible for CEQA compliance, referred to as the "lead agency," finds substantial evidence that a project may have a significant environmental impact, the agency must prepare and certify an EIR before approving or proceeding with the project.'" (*County of Butte*, at p. 158, fn. omitted; see *County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 627; CEQA Guidelines, § 15063, subd. (a).)

"An EIR, as courts have often said, is the heart of CEQA." (*County of Butte, supra*, 90 Cal.App.5th at p. 158, internal quotation marks omitted; see *Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th

497, 511; *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162 (*Bay-Delta*).)  An EIR "serves to '(1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, those impacts; (3) require project changes through alternatives or mitigation measures when feasible; and (4) disclose the government's rationale for approving a project.'"  (*County of Butte*, at p. 158; see *Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 488; see also *Southwest Regional Council of Carpenters v. City of Los Angeles* (2022) 76 Cal.App.5th 1154, 1171 ["An EIR 'is an informational document' designed to 'provide public agencies and the public in general with detailed information about the effect [of] a proposed project . . . on the environment.'"].)  "To fulfill these purposes, an 'EIR "must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project."'" (*County of Butte*, at p. 158; see *Cleveland National Forest Foundation*, at p. 511.)

To comply with CEQA an EIR also "must include a description of the proposed project and its environmental setting and discussions of (1) the possible environmental effects of the project, (2) feasible measures to mitigate any significant, adverse environmental effects of the project, (3) the comparative environmental effects of a range of reasonable alternatives to the proposed project, including a 'no project' alternative, and (4) the cumulative impact of the project's various environmental effects." (*County of Butte v. Department of Water Resources*, *supra*, 13 Cal.5th at p. 627; see *Yerba Buena Neighborhood Consortium, LLC v. Regents of University of California* (2023) 95 Cal.App.5th

10

779, 791 (*Yerba Buena Neighborhood Consortium*).) "The sufficiency of an EIR is to be evaluated in light of what is reasonably feasible." (*Southwest Regional Council of Carpenters v. City of Los Angeles, supra*, 76 Cal.App.5th at p. 1173; see CEQA Guidelines, § 15151.) The overriding issue on review is thus whether the lead agency reasonably and in good faith discussed a project in detail sufficient to enable the public to discern from the EIR the "'analytic route the . . . agency traveled from evidence to action.'" (*Southwest Regional Council of Carpenters*, at p. 1173; see *People ex rel. Bonta v. County of Lake* (2024) 105 Cal.App.5th 1222, 1230.) "But that does not mean an EIR must be exhaustive on all topics. Courts look "'not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.'"'" (*County of Butte, supra*, 90 Cal.App.5th at p. 158; see *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 515; *Bay-Delta, supra*, 43 Cal.4th at p. 1175.)

"On appeal from a judgment in a mandamus proceeding under CEQA, our standard of review is the same as the trial court's: we independently review the administrative record and the lead agency's action, not the trial court's decision and in this sense our review under CEQA is de novo." (*Upland Community First v. City of Upland* (2024) 105 Cal.App.5th 1, 14; see *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427; *People ex rel. Bonta v. County of Lake, supra*, 105 Cal.App.5th at p. 1231.) In reviewing whether an agency has complied with CEQA, however, our inquiry extends "'only to whether there was a prejudicial abuse of discretion.'" (*Vineyard Area Citizens*, at p. 426; see Pub. Resources Code, § 21168.5; *Planning & Conservation League v. Department of Water Resources* (2024) 98 Cal.App.5th 726,

11

748.)[6]  "Such an abuse is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence. . . .  Therefore, we resolve the CEQA issues before us by independently determining whether the administrative record demonstrates any legal error by the [agency] and whether it contains substantial evidence to support the [agency's] factual determinations."  (*Planning & Conservation League*, at p. 748, internal quotation marks omitted; see *Vineyard Area Citizens*, at p. 427.)

"'"Judicial review of these two types of error differs significantly:  While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions.  In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.'"'"  (*County of Butte, supra*, 90 Cal.App.5th at p. 158.)  Mixed questions of law and fact—such as whether an EIR's discussion of environmental impacts is adequate—are generally subject to independent review, but a more deferential standard may be warranted in circumstances where factual questions predominate.  (*People ex rel. Bonta v. County of Lake, supra*, 105 Cal.App.5th at p. 1238; see *Sierra Club v. County of Fresno, supra*, 6 Cal.5th at p. 513; *County of Butte*, at p. 159.)

---

[6]     Undesignated statutory references are to the Public Resources Code.

"A violation of CEQA's procedural requirements 'is deemed prejudicial if it deprived the public and decision makers of substantial relevant information about the project's likely adverse impacts.'" (*Yerba Buena Neighborhood Consortium*, *supra*, 95 Cal.App.5th at p. 793; see *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463.) "An agency's failure to disclose required information 'may be prejudicial "regardless of whether a different outcome would have resulted if the public agency had complied" with the law,' but '[i]nsubstantial or merely technical omissions are not grounds for relief.'" (*Yerba Buena Neighborhood Consortium*, at p. 793; accord, *Neighbors for Smart Rail*, at p. 463; see *Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 709 ["we must look at the nature of the county's noncompliance to determine if it was of the sort that "'preclude[d] informed decisionmaking and informed public participation"'"], disapproved on another ground in *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1194 & fn. 10.)

B.     *The Project Description Was Not Prejudicially Misleading*

The Organization argues the Project's name and certain aspects of its description were misleading because they used the term "restoration." The Organization's argument fails.

1.     *Applicable Law*

"An accurate and complete project description is necessary for an intelligent evaluation of a project's potential environmental impacts. [Citations.] It must contain sufficient information to understand the project's environmental impacts.

13

[Citation.] 'Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance.'" (*Save Our Capitol! v. Department of General Services* (2023) 87 Cal.App.5th 655, 673; see *Tulare Lake Canal Co. v. Stratford Public Utility Dist.* (2023) 92 Cal.App.5th 380, 402.) "'A project description that gives conflicting signals to decision makers and the public about the nature of the project is fundamentally inadequate and misleading.'" (*Save Our Capitol!*, at p. 674; see *Southwest Regional Council of Carpenters v. City of Los Angeles*, *supra*, 76 Cal.App.5th at p. 1173.) Thus, a project description violates CEQA if it "may have thwarted the public's ability to participate in the process and comment meaningfully on the EIR." (*Save Our Capitol!*, at p. 674.) "Whether the EIR contains an accurate . . . project description is a question of law subject to de novo review." (*Id.* at p. 673.)

> 2. *The Draft EIR's Use of "Restoration" Did Not Thwart the Public's Ability To Participate and Comment Meaningfully on the Project*

As stated, the name of the Project is "Restoration of the Ballona Reserve." The draft EIR introduced the Project as follows: "What once were more than 2,100-acres of marshes, mud flats, salt pans, and sand dunes currently provides approximately 153 acres of wetland habitat, as well as 83 acres of non-wetland waters of the U.S.[7]. . . . All aquatic resources within the reserve

---

[7] "Waters of the United States" includes wetlands adjacent to "[r]elatively permanent, standing or continuously flowing bodies

14

are degraded.  The [Department] proposes a large-scale restoration that would entail enhancing and establishing native coastal aquatic and upland habitats within the Ballona Reserve. The proposal is intended *to return the daily ebb and flow of tidal waters* where practically feasible to achieve predominantly estuarine conditions, maintain freshwater conditions, and enhance physical and biological functions within the Ballona Reserve. . . .  [¶]  . . .  To varying extents, each of the restoration alternatives would enhance and create native coastal wetland, other aquatic resources, and upland habitats; improve flood and storm water management in the surrounding area; provide public access and visitor amenities; and modify infrastructure and utilities within the reserve to support the restoration efforts." (Italics added.)  The Organization contends the EIR's use of the term "restore" (or any variation of the word) and its reference to the historic "daily ebb and flow of tidal waters" misled the public and thwarted meaningful participation.  The Department argues the EIR's description of the historic conditions in the Ballona wetlands was accurate and, in any case, whether the area was historically subject to tidal influence is not relevant to assessing the Project's potential environmental impacts.  The Department is mostly correct.

---

of water . . . and with a continuous surface connection to those waters."  (33 C.F.R. § 328.3(a)(4)(ii) (2024).)

15

a. *The Draft EIR's Descriptions of Historic and Current Conditions at the Ballona Reserve Were Consistent with Scientific Studies*

The Organization argues the Project "is not 'restoration' of the daily ebb and flow of tidal waters, because the Ballona Wetlands was rarely open to the [o]cean, except for short periods after heavy rains." But the draft EIR described these same historic conditions: "Compared to the Ballona Reserve today . . . , the historic Ballona Lagoon wetlands in the late 1800s included a larger area of freshwater, brackish, and tidally affected saltmarsh habitats that transitioned into a more alkaline/freshwater system approximately 1.5 miles inland from the coast (Dark et al. 2011).[8] The mouth of Ballona Creek often was closed to the ocean by a sand berm along the beach, causing perching of water within the Ballona Lagoon (Jacobs et al. 2010).[9] During wet weather periods when stream flow discharge was high enough to overflow and/or scour a channel to the ocean, the Ballona Creek mouth was open to the ocean (Jacobs et al. 2010) and likely experienced some degree of tidal influence until the sand berm reformed across the mouth, causing it to close." (The draft EIR described these same conditions several pages later.) As indicated in this excerpt, the draft EIR cited two scientific studies the Organization also cites for its assertion the

---

8 Dark et al., Historical Ecology of the Ballona Creek Watershed (2011).

9 Jacobs et al., Classification of California Estuaries Based on Natural Closure Patterns: Templates for Restoration and Management (Rev. Aug. 2011).

Ballona Reserve "only experienced tidal estuarine conditions for short periods after heavy rains." On that point, there appears to be no disagreement.

      b.     *The Draft EIR's Use of "Restoration" Accurately Described Many Features of the Project*

The Organization appears to argue that, because the draft EIR suggested the Ballona Reserve once experienced "the daily ebb and flow of tidal waters," when in fact tidal waters historically inundated the Reserve only during periods of heavy rains, the draft EIR's use of the term "restore" was misleading. The Organization cites the draft EIR's reference to the federal definition of "restoration," which states: "Restoration means the manipulation of the physical, chemical, or biological characteristics of a site with the goal of returning natural/historic functions to a former or degraded aquatic resource." (33 C.F.R. § 332.2 (2024).) The Organization asserts that, because the Reserve never experienced a "daily ebb and flow of tidal waters," the Project's goal of establishing habitats affected by tidal flow will not return any "natural/historic functions."

The draft EIR, however, explained at length its use of the term "restoration": "It should be noted that the proposed restoration includes elements of both habitat *restoration* and habitat *creation*." The Lead Agencies' "understanding of the historical ecology of the Ballona region is largely inferred from historical accounts of the Los Angeles coast (e.g., Dark et al. 2011); few hard data exist regarding historical habitat

17

composition or ecosystem function at the [Ballona Reserve].[10] Moreover, development within the Ballona Creek watershed and the associated need for flood control greatly limit the options available for restoration. Some aspects of the restoration plan involve 'restoration' in the sense of recovering historical conditions. However, most aspects of the restoration plan involve reestablishment of natural processes and ecological functions and either habitat creation (i.e., creating a particular type of habitat where it previously did not exist) or habitat enhancement (i.e., modification of existing conditions). However, to avoid overcomplicating the [EIR], the term 'restoration' was used throughout the text and is meant to encompass all of these elements and not only the re-creation of a historical condition."

Indeed, the Project consists of much more than creating tidally affected habitats. For example, the draft EIR stated Alternative 1 would, among other things, restore the connection between Ballona Creek and a broader wetland floodplain by removing the existing levees, realign Ballona Creek to a more meandering channel, and create "dynamic interactions" between the Ballona Creek channel, the Ballona Reserve, and the Santa Monica Bay. Each of these components would return some type of "natural/historic function" to the Ballona Reserve and thus "restore" the area, even under the federal definition. (See 33 C.F.R. § 332.2 (2024).) The Organization's sole focus on whether returning the "daily ebb and flow of tidal waters" to the

---

[10]     Indeed, the Dark study states "obtain[ing] consistent corroborating evidence for the system" is "difficult" because sources provided "conflicting and broad descriptions as to the historical habitat and ecological communities."

Ballona Reserve is technically a "restoration" misses the forest for the trees (or the wetlands for the hydrophytes).

Moreover, as the Organization acknowledges, the administrative record includes evidence the Ballona Reserve historically included tidal marshes, though those marshes may not have been the predominant habitat. The Dark study states that in the late 1800's about "half of the aggregate Ballona Lagoon area consisted of a freshwater and tidally affected saltmarsh and brackish habitats that transitioned into a more alkaline/freshwater system about 1.5 miles (2.4 km) inland." That study also states the "[h]istorical habitat of the Ballona Lagoon coastal complex consisted of substantial amounts of brackish to salt marsh/tidal marsh habitat." Thus, creating any amount of tidal marsh habitat (which, by definition, requires occasional tidal inundation) where there currently is none "restores" that habitat to the Ballona Reserve.

> c.  *The Draft EIR's Reference to the Daily Ebb and Flow of Tidal Waters Was Not Prejudicially Misleading*

The EIR appears to acknowledge the Ballona Reserve has not experienced daily ebbs and flows of tidal waters in recent history;[11] thus, its use of that phrase is arguably misleading. But the Organization has not shown how that phrase thwarted the public's ability to understand the Project and comment meaningfully on the EIR. The Organization argues commenters "may mistakenly believe that the project constitutes 'restoration'

---

[11]  Studies suggest it has been approximately 2,000 years since the Ballona estuary became trapped by a sand barrier and frequently closed to the ocean.

and not creation." As discussed, however, the draft EIR explained its use of the term "restoration," and many aspects of the Project comport with the EIR's definition of that term. The EIR also stated multiple times the Project would "establish" or "create" estuarine and associated habitats in addition to restoring them. Thus, it is unclear how, and unlikely that, the public would be misled by the draft EIR's use of the term "restoration."

The Organization also suggests the perception of the Project as a "restoration" might affect the public's willingness to approve the Project, which the Organization claims favors "one habitat type over another." The Organization contends the public "may feel very differently" if it knew the Project would "destroy[ ] very rare alkali meadow and salt pan in favor of habitat that has not existed at the Ballona Wetlands for over 2,000 years." But the Organization does not contend the draft EIR inaccurately describes the habitats that currently exist or that would exist at the Ballona Reserve after implementation of Alternative 1. Regarding alkali meadow, the evidence cited by the Organization shows only that such meadows previously existed in a portion of the Ballona Reserve, but do not currently exist. Regarding salt pan, the EIR shows Alternative 1 would actually increase the acreage of salt pan, not destroy it. Moreover, a chart in the draft EIR listed 19 habitat types and the acreage for each that currently exist and that would exist after implementing Alternative 1. The chart makes clear "[t]here is no fully tidal marsh under existing conditions," but after implementing Alternative 1, there would be 153.4 acres of tidal marsh. Thus, the public was under no illusion about the tradeoffs described by the Organization.

Finally, as the Department correctly points out, whether the Ballona Reserve was historically subject to tidal influence is not relevant or necessary for the public to understand and comment on the environmental impact the Project would have on current conditions.  (See *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority*, *supra*, 57 Cal.4th at p. 452 [potential environmental impacts are to be measured against a baseline that describes existing environmental conditions]; *Anderson v. County of Santa Barbara* (2023) 94 Cal.App.5th 554, 572 [same]; *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428, 1453 ["environmental impacts should be examined in light of the environment as it exists when a project is approved"]; CEQA Guidelines, §§ 15125, subd. (a)(1), 15126.2, subd. (a).)  Thus, because CEQA requires an EIR to assess a project's effects based on the conditions as they exist at the time of the analysis, whether the Ballona Reserve experienced the daily ebb and flow of tidal waters in the distant past is not relevant to the EIR's analysis and does not affect the public's ability to comment meaningfully on the Project.

For the first time in its reply brief, the Organization argues the Department's "mischaracterization" of the Ballona Reserve impacted its baseline analysis of environmental impacts.  The Organization contends the Department used an assessment method intended for estuarine habitats, even though there are also non-estuarine habitats at the Reserve.  It is unclear whether the Organization is arguing substantial evidence did not support the Department's use of the chosen assessment model, but even if the Organization had not forfeited this argument by failing to raise it in its opening brief (see *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 518), the

21

Organization has not identified how the Department's arguably inferior assessment model affected the public's ability to meaningfully comment on the Project or its environmental impacts.  The Organization suggests only that the statement in the draft EIR that "a portion of the Ballona Reserve has been identified as 'among the most degraded wetlands in California' using standardized wetland condition protocols" was tainted by an artificially low assessment "score."  But the Organization cites no evidence showing how a higher score derived from using a different model would affect the EIR's description of the Project or its environmental impacts.  Moreover, the draft EIR cited the United States Environmental Protection Agency and another study to support the statement that all wetland habitats within the Ballona Reserve are impaired.  Substantial evidence supported that conclusion.

## C. *The Department Considered a Reasonable Range of Alternatives*

### 1. *Applicable Law*

CEQA requires the lead agency to "consider potentially feasible alternatives to a project" that "would avoid or substantially lessen a project's significant environmental impacts, 'accomplish most of the basic objectives of the project,' and be at least potentially feasible."  (*California Natural Gas Vehicle Coalition v. State Air Resources Bd.* (2024) 105 Cal.App.5th 304, 322 (*California Natural Gas Vehicle Coalition*); see *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 565; *People ex rel. Bonta v. County of Lake, supra*, 105 Cal.App.5th at p. 1233.)  "The lead agency is

22

responsible for proposing the alternatives considered and, although they need not consider every potential alternative, must select 'a range of reasonable alternatives to the project.'" (*California Natural Gas Vehicle Coalition*, at p. 322; see *Citizens of Goleta Valley*, at p. 565; CEQA Guidelines, § 15126.6, subds. (a)-(c), (f).) The EIR need only "identify those alternatives necessary to permit a reasoned choice and then must examine in detail only those that "'the lead agency determines could feasibly attain most of the basic objectives of the project."'" (*California Natural Gas Vehicle Coalition*, at p. 323; see *Bay-Delta*, *supra*, 43 Cal.4th at p. 1163.) "'There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than [this] rule of reason.'" (*Bay-Delta*, at p. 1163; see *California Natural Gas Vehicle Coalition*, at p. 323; CEQA Guidelines, § 15126.6, subd. (f).)

"The lead agency begins by establishing the project objectives. [Citation.] The EIR 'need not study in detail an alternative that is infeasible or that the lead agency has reasonably determined cannot achieve the project's underlying fundamental purpose.' [Citation.] 'Although a lead agency may not give a project's purpose an artificially narrow definition, a lead agency may structure its EIR alternative analysis around a reasonable definition of underlying purpose and need not study alternatives that cannot achieve that basic goal.'" (*California Natural Gas Vehicle Coalition*, *supra*, 105 Cal.App.5th at p. 323; see *Bay-Delta, supra,* 43 Cal.4th at p. 1163.) "'CEQA does not require that an agency consider specific alternatives that are proposed by members of the public or other outside agencies.'" (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 256; see *City of Maywood*

*v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 420.) An EIR, however, "should not exclude an alternative from detailed consideration merely because it 'would impede to some degree the attainment of the project objectives.'" (*Bay-Delta*, at p. 1165; see *Yerba Buena Neighborhood Consortium*, *supra*, 95 Cal.App.5th at p. 791; CEQA Guidelines, § 15126.6, subd. (b).)

"We presume an EIR complies with the rule of reason; it is the appellant's 'burden to demonstrate that the alternatives analysis is deficient.'" (*California Natural Gas Vehicle Coalition*, *supra*, 105 Cal.App.5th at p. 323; see *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 987.) "We thus defer to the selection of alternatives unless the [appellant] (1) demonstrates the alternatives selected are manifestly unreasonable and . . . do not contribute to a reasonable range of alternatives and (2) identifies evidence of an alternative that was both feasible and adequate, because it was capable of attaining most of the basic objectives of the project." (*California Natural Gas Vehicle Coalition*, at p. 323, internal quotation marks omitted; see *Yerba Buena Neighborhood Consortium*, *supra*, 95 Cal.App.5th at p. 796; *Save Our Access etc. v. Watershed Conservation Authority* (2021) 68 Cal.App.5th 8, 30; *South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 345.) "We 'review an agency's substantive factual or policy determinations for substantial evidence.' [Citation.] [¶] . . . The question before us at the stage where the lead agency chooses which alternatives to consider and which to reject is whether the decision is supported by substantial evidence and comports with the rule of reason." (*California Natural Gas Vehicle Coalition*, at p. 323; see

24

*Bay-Delta*, *supra*, 43 Cal.4th at p. 1167; *California Native Plant Society*, at p. 957.)

> ###### 2. *The Organization Has Not Shown the Department's Selection of Alternatives Was Manifestly Unreasonable*

The Organization contends the EIR's mischaracterization of the ecological history of the Ballona Reserve artificially narrowed the purposes of the Project to "require tidal inundation and increasing tidal influence." This narrow claimed purpose, the Organization argues, necessarily excluded from analysis and consideration the "freshwater alternative" described in Alternative 10, which the Department rejected for detailed review. That alternative would have left in place the fill deposited in the Ballona Reserve and the existing levees and would have pumped fresh water into upland areas to create fresh and brackish wetlands and seasonal wetland habitats. The Organization, however, has not shown that the Project's scope was artificially narrow or that the range of alternatives considered by the EIR was unreasonable. As a result, we do not consider whether Alternative 10 was feasible and adequate. (See *California Natural Gas Vehicle Coalition*, *supra*, 105 Cal.App.5th at p. 323; *Yerba Buena Neighborhood Consortium*, *supra*, 95 Cal.App.5th at p. 796.)

The "fundamental purposes" or "basic objectives" (*Bay-Delta*, *supra*, 43 Cal.4th at p. 1166) of the Project include establishing "natural processes and functions within the Ballona Reserve that support estuarine and associated habitats through measures such as improving tidal circulation into the wetlands to enlarge the amount of area that is tidally inundated . . . and

creating dynamic hydrological interactions between the Ballona Creek channel, wetlands within the Ballona Reserve, and the Santa Monica Bay."[12]  The Department prioritized "estuarine and associated habitats," including tidal wetlands, because they are "rare in the region" and suitable conditions for restoration exist in only a few places.  In discussing the historical context underlying the Department's choice of alternatives, the final EIR observed that the loss of coastal wetlands has contributed to decreased biodiversity.  The final EIR cited several studies to support these observations, including the Ballona Wetlands Feasibility Report,[13] which states:  "The project site represents the only opportunity to restore a large tidal wetland in Santa Monica Bay, and fills a large gap in the chain of wetlands along the Southern California coast."  The Organization does not contend otherwise.

The range of alternatives analyzed in the EIR reflected the Department's priority for creating a coastal wetland and included three alternatives and a "no project" alternative: Alternative 1, Full Tidal Restoration/Proposed Action; Alternative 2, Restored Partial Sinuous Creek; and Alternative 3, Levee Culverts and Oxbow.  As stated, in contrast to Alternative 1, Alternatives 2 and 3 would affect a smaller area of the Ballona Reserve and remove less or none of the existing concrete levees.  Each of the considered alternatives would promote new estuarine habitats to

---

[12]     In total, the draft EIR identifies seven "CEQA objectives."

[13]     Philip Williams & Associates, Ltd. et al., Ballona Wetlands Feasibility Report (Sept. 2008), included in an appendix to the draft EIR.

26

some degree and feature some tidal influence.  A "predominantly freshwater" alternative would not.[14]

Substantial evidence supported the Department's decision to prioritize estuarine and associated habitats, and the Department selected a reasonable range of alternatives to accomplish that priority.  (See *Center for Biological Diversity v. Department of Fish & Wildlife*, *supra*, 234 Cal.App.4th at p. 256 ["'[I]f a reasonable basis for the choices the agency makes is found in the EIR or elsewhere in the record, a reviewing court will defer to the agency's selection of alternatives.'"].)  The Department might have chosen to prioritize freshwater habitats and their associated plants and wildlife and thus analyzed a freshwater alternative.  But courts may not set aside an agency's approval of an EIR on the ground an opposite conclusion would have been equally or more reasonable.  (*Bay-Delta*, *supra*, 43 Cal.4th at pp. 1161-1162; *California Natural Gas Vehicle Coalition*, *supra*, 105 Cal.App.5th at p. 324.)  Given the scope of the project objectives, defining the Project to require some amount of tidal influence was not unduly narrow, and the EIR's range of alternatives "permit[ed] a reasoned choice."  (*California Natural Gas Vehicle Coalition*, at p. 326; see *Yerba Buena Neighborhood Consortium*, *supra*, 95 Cal.App.5th at p. 798.)

The Organization cites *We Advocate Thorough Environmental Review v. County of Siskiyou* (2022) 78 Cal.App.5th 683, where the court held an EIR's stated objectives "were 'so narrow[ ] as to preclude any alternative other

---

[14]    The Department identified several reasons for excluding Alternative 10 or a different freshwater alternative from full consideration, including feasibility, which, as stated, we do not address.

than the Project.'" (*Id.* at p. 692.)  The project in that case was a bottling facility on a site formerly developed and operated as a bottling plant.  (*Ibid.*)  The stated project objectives "mirror[ed] the proposed project itself," including "use of 'the full production capacity of the existing Plant,'" locating the proposed facility "at the Plant," and allowing the "'operation of the Plant as soon as possible.'"  (*Ibid.*)  The court stated that, "if the principal project objective is simply pursuing the proposed project, then no alternative other than the proposed project would do."  (*Ibid.*)

The EIR did not define the Project so narrowly that no alternative other than Alternative 1 would accomplish the Project's objectives.  The EIR included two very different alternatives that would accomplish some of the Project objectives while mitigating some of its impacts.  Thus, this case is more like *California Natural Gas Vehicle Coalition*, *supra*, 105 Cal.App.5th 304, where the project's goal was to transition certain transport sectors to zero-emission vehicles.  (*Id.* at p. 324.)  The EIR in that case considered four alternatives to achieve the project's purpose, but excluded from consideration an alternative that would have allowed the use of low-emission vehicles as an interim step to zero-emission technology.  (*Ibid.*)  The agency rejected from consideration the low-emission alternative because it would "'not advance the adoption of heavy-duty zero-emission technologies and develop a self-sustaining [zero-emission] truck market.'"  (*Id.* at p. 315.)  In rejecting a challenge to the agency's exclusion of the low-emission alternative, the court stated:  "Given the overall scope of the project objectives, this court does not see defining the project as a move to [zero-emission vehicles] to be unduly narrow or lacking substantial evidence."  (*Id.* at p. 324.)  The court held: "The identified objectives of the [project] provide substantial

28

evidence supporting the conclusion that an alternative reaching similar goals but, in a manner, contradicting those objectives fails to achieve the project's fundamental purpose." (*Ibid.*; see *Bay-Delta*, *supra*, 43 Cal.4th at p. 1166 [permitting an agency to reject inland building sites as an alternative for a planned oceanfront development].) Similarly, given the importance of the Department's objective to create estuarine and associated habitats, substantial evidence supported the Department's decision to exclude a freshwater alternative from the range of alternatives. (See *Yerba Buena Neighborhood Consortium*, *supra*, 95 Cal.App.5th at p. 798 [agency briefly addressed and reasonably excluded from consideration an alternative to place a project at a different location given the importance of location to the project objectives].)

D. *The EIR Sufficiently Addressed the Corps'*
   *Landscaping Guidelines*

The Organization contends the Department deprived the public of substantial relevant information by excluding certain information about the Corps' landscaping guidelines from the draft EIR and in responses to comments on it. In particular, the Organization argues the Department failed to disclose the Corps has "specific maintenance requirements for levees that significantly degrade[ ] such habitat for wildlife," discourage burrowing animals, and require a "vegetation free zone" that is the width of the levee plus 15 feet on each side.

But the draft EIR and the Department's responses to comments disclosed much of this information, at least in sufficient detail to allow the public to understand and meaningfully comment on the Project. The draft EIR stated in an

appendix titled "Preliminary Operations and Maintenance Plan" that the perimeter levees must be maintained in accordance with the Corps' landscaping guidelines for planting and vegetation at levees; it also provided a full citation to those guidelines.[15]  The draft EIR identified three zones for vegetation on or near the levees that complied with the landscaping guidelines, including a "Vegetation Free Zone" extending 15 feet beyond "the toe of the levee core," a "Vegetation Management Zone" extending another 15 feet, and a "Habitat Zone."  The draft EIR stated the Vegetation Free Zone would support only grasses that had to be mowed "to facilitate inspection of the levee core," while the Vegetation Management Zone would provide grasses and low shrubs that could be mowed or removed as necessary to facilitate maintenance and inspections.  The Habitat Zone would support "the full range of habitat plantings included in the upland and transitional habitat mix."  The draft EIR also included a map of the Project site showing the areas subject to the Corps' maintenance requirements, a drawing of a levee cross-section showing where and to what extent maintenance would be required, and the dimensions of the levees.

The Organization contends the draft EIR failed to acknowledge the "reduced habitat values" for areas subject to the

---

[15]    The Organization argues for the first time on appeal the EIR's failure to include a copy of the Corps' landscaping guidelines deprived the public of sufficient information to meaningfully comment on the Project.  In the trial court, however, the Organization acknowledged the guidelines document "is readily available to . . . the public."  In any event, the Organization has not shown how the Department's omission of the Corps' "readily available" landscaping guidelines prejudiced public participation.

30

Corps' maintenance requirements. The Organization cites a public comment stating that, to comply with the Corps' landscaping guidelines, the Project would have to include at least 36 acres of upland habitat, including the levees, from which rodents and burrowing animals would be excluded. In response, the Department added a footnote to a table summarizing habitat acreages created by each alternative "to clarify that areas requiring annual vegetation management . . . are important to wildlife species such as burrowing owls and ground squirrels that rely on the availability of relatively short grasslands." The response also stated that "[b]oth of these species thrive under management conditions such as grazing and mowing that result in short stature vegetation" and that "vegetation maintenance on the levees" would "not be needed regularly."

The Organization does not argue substantial evidence did not support this response. Instead, the Organization argues the Department's response was insufficient because it "failed to identify the acreage of maintained habitat." As indicated by the public comment identifying 36 acres impacted by the Corps' landscaping guidelines, the public was able to get a pretty close approximation. Moreover, the Department's response indicated the Corps' landscaping guidelines are unlikely to degrade the upland habitat area as much as the Organization suggests they will. And the Organization does not explain how the EIR's failure to state the precise acreage of maintained habitat precluded informed public participation.[16]

---

[16] The Organization also argues the Department's response to a comment from the Los Angeles County Flood Control District stating the EIR did not disclose and analyze environmental impacts from post-restoration operations and maintenance

31

E.      *The Lack of a Vegetation Map Did Not Preclude the Public from Evaluating Environmental Impacts in High Marsh and Upland Habitats*

The Organization acknowledges the draft EIR included a map listing the types of post-restoration habitats and showing where each habitat will be located at the Project site.  The Organization also acknowledges the EIR identified the acreage of each type of habitat that will exist after the Project is completed, including "high marsh" and "upland" habitats.  The Organization faults the EIR, however, for failing to include a vegetation map with an "actual planting plan."  The Organization claims this omission "renders it difficult, if not impossible, to evaluate the significant impacts to species that rely on [high] marsh and upland habitats."

It is true the EIR did not include a vegetation map.  The EIR, however, provided a lot of information about the types of habitats enhanced or created under Alternative 1, including detailed descriptions of the "vegetation communities" to be established for each habitat.  Here's a taste of those descriptions:

For tidal marsh habitats, the draft EIR stated the "primary targeted species for tidal wetland restoration at the [Ballona Reserve] include Pacific cordgrass in the low to mid-marsh zones, pickleweed in the mid-marsh to high-marsh zones, and a combination of Parish's glasswort (*Arthrocnemum subterminale*),

_____

activities was deficient.  The Organization does not explain how the Department's response was deficient or even cite the Department's response.  The Organization also fails to acknowledge the draft EIR addressed "Post-Restoration" impacts, including from "maintenance activities."  The Organization has not shown the EIR omitted necessary information concerning the impacts of post-restoration maintenance.

shoregrass (*Monanthochloe littoralis*), saltgrass, alkali heath, and coastal gumweed (*Grindelia stricta*) in the high marsh zone."

For brackish marsh, the draft EIR stated that "it will be difficult to predict the extent to which brackish conditions will develop, and it is likely that such conditions will vary from season to season and from year to year," but that "[v]egetation should include some combination of California bulrush, southern cattail, ditch grass, spiny rush, pickle weed, saltgrass, alkali heath, and other species typical of habitats ranging from freshwater to tidal wetlands . . . .  Target acreages for brackish marsh should be flexible, as it is likely that the extent of brackish conditions will shift from season to season and year to year."

For salt pan, the draft EIR explained that "[i]t is unclear how long it may take for salinity to reach levels sufficient" to develop salt pans and that "typical tidal marsh plant species such as Parish's glasswort, pickleweed, and saltgrass may become established in a developing salt pan[ ] when surface salinities are not yet elevated."  The draft EIR also stated "[w]eeds with some salt tolerance such as perennial pepperweed (*Lepidium latifolium*) may also become established during the initial years of the restoration when salinity levels are relatively low."  Eventually, however, salinity levels in the salt pans should exclude most plants.

For seasonal wetlands (including non-tidal salt marsh), the draft EIR explained the "duration and depth of ponding is the major determinant of plant community development in seasonal wetlands [citation].  Longer periods and deeper depths of ponding will result in vegetation dominated by wetland-adapted, sometimes perennial species, whereas shorter periods and more shallow depths of ponding may result in vegetation dominated by

33

annual species adapted to fluctuating moisture regimes. At the [Ballona Reserve], soil salinity will also play a major role in determining the plant communities that will develop in seasonal wetlands." In general, the draft EIR stated, "seasonal wetlands on coastal terraces in the Ballona region supported a high diversity of freshwater vernal pool plant species," and the "focus of seasonal wetland restoration in areas of low-salinity soils at the Reserve will be on the creation of shallow depressions with appropriate soils for supporting a similar assemblage of southern California vernal pool plant species."

For riparian scrub and woodland habitats, including an existing eucalyptus grove located at the Project site, the draft EIR stated the grove initially would be preserved because the trees are currently used as roosting habitat for monarch butterfly. The eucalyptus trees eventually would be replaced with native trees suitable for the site and for monarch roosting. Regarding riparian scrub areas, the draft EIR stated the Department will incorporate "appropriate native riparian plants . . . to increase diversity and provide appropriate habitat structure for riparian wildlife species."

For coastal dune areas the draft EIR stated the Department will encourage "both common and rare native dune species," including "special-status plants (e.g., South Coast branching phacelia) as well as potential host plants for special-status invertebrates (e.g., El Segundo blue butterfly)." "Target vegetation for existing and created dune habitat will be similar in diversity and structure to stabilized back-dune systems in the region, with high diversity and cover of native species, including both woody perennials and herbaceous annuals."

The draft EIR stated upland scrub and grassland areas will feature "grasslands dominated by species such as California barley (*Hordeum brachyantherum* ssp. *californicum*), purple needlegrass (*Stipa [Nassella] pulchra*), saltgrass, and alkali ryegrass (*Elymus triticoides*) and scrub dominated by species such as coyote brush, California sagebrush (*Artemisia californica*), mugwort (*Artemisia douglasiana*), big saltbush, lemonade berry (*Rhus integrifolia*), and seacliff buckwheat (*Eriogonum parvifolium*). Additional species will be included in both upland habitat types to increase overall native plant diversity."

The draft EIR also included a 16-page list of potential plants for each type of habitat in the Ballona Reserve post-implementation, as well as performance criteria for vegetation in each type of habitat for up to 10 years post-implementation. This list, along with the map showing each type of habitat and its location in the Reserve and the table listing the approximate size of each habitat, provided sufficient information for the public to comment on potential impacts to species that rely on high marsh and upland habitats. It is hard to see how a vegetation map would add much to all of this detailed information or make it easier for the public to submit comments.

The Organization argues certain areas will not be available for habitat development because they will include bike paths, a pedestrian trail, and areas on or near levees subject to the Corps' maintenance requirements. The Organization cites a public comment asking whether "the requisite habitat elements" necessary to support certain wildlife can "fit within the area left over" and stating "a post-project vegetation map . . . could be used to answer that question." But the EIR disclosed the sizes of each

of these components of the Project, and neither the comment nor the Organization explains how the public needs a vegetation map (that necessarily would be preliminary, given the uncertainties for habitat development cited in the draft EIR), in addition to the wealth of information already provided, to determine whether the listed habitats will support certain species.

The Organization characterizes the EIR's contingent vegetation plans as "deferred mitigation," which the Organization asserts is permissible only when the lead agency cannot obtain certain information at the time an EIR is prepared. (See *People ex rel. Bonta v. County of Lake*, *supra*, 105 Cal.App.5th at p. 1236 [mitigation measure's specific details may be developed after project approval when it is impractical or infeasible to include those details during a project's environmental review]; *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 280 [same].) Organization contends the necessary information is available because the Department can "work with the Army Corps and develop a proposed or final vegetation map." Even accepting the Organization's characterization of the EIR's vegetation plans as "mitigation," it is unclear (and the Organization does not specify) how a "proposed" map would provide any more information than what the EIR already provided. Moreover, the draft EIR explained in several places why the Department cannot now identify specific species that will thrive in certain habitats, and the Organization does not argue substantial evidence did not support these explanations. A "final" map is not currently feasible.

CEQA requires only "a good faith effort at full disclosure." (*County of Butte*, *supra*, 90 Cal.App.5th at p. 158, internal quotation marks omitted; see *Sierra Club v. County of Fresno*,

36

*supra*, 6 Cal.5th at p. 515.)  The EIR's habitat map, list of habitats, detailed specifications for the types of vegetation to be planted or maintained for each habitat, and performance criteria for each habitat and its vegetation met this standard.

F.    *The EIR Sufficiently Addressed Potential Short-term Impacts to White-tailed Kites, and Substantial Evidence Supported the EIR's Finding of No Significant Short-term Impacts*

The Organization argues the EIR failed to identify certain short-term environmental impacts to the protected white-tailed kite.  (See Fish & G. Code, § 3511, subd. (b)(10).)  The Organization also argues substantial evidence did not support the EIR's finding the short-term impacts to raptors like white-tailed kites are not significant.

1.    *The EIR Identifies Potential Impacts on White-tailed Kites and Their Foraging Habitat*

The white-tailed kite is a species of raptor that appears in the Ballona Reserve "largely in a foraging role."  The draft EIR reported "[t]wo to three kites are expected at the Reserve" from mid-summer through mid-winter.  White-tailed kites prey on small mammals and rodents such as voles and mice, which can be found in coastal scrub, non-tidal salt marsh, and annual grassland habitats.  The draft EIR states the entire Project site, including new tidal marsh habitat, also "has the potential to be utilized for foraging by raptors" and "represents an exceedingly important foraging area for raptors."

The draft EIR stated Alternative 1, if not mitigated, would "result in a limited adverse impact" to special-status raptor

37

species such as the white-tailed kite.  The draft EIR stated that a "portion of foraging habitat" would be "temporarily impacted and not available for foraging" during the two implementation phases of the Project, but that "the majority of the Ballona Reserve containing suitable foraging habitat would remain."  The draft EIR stated implementing the "Habitat Restoration and Monitoring Plan" and Mitigation Measure BIO-1i-i, Nesting Bird and Raptor Avoidance would further reduce any remaining potential impacts to a "less-than-significant level."  The Habitat Restoration and Monitoring Plan is "a mechanism to implement the standards and criteria" for every habitat type and species impacted by the Project.  It includes monitoring the Project site during and after implementation to meet performance criteria for habitat development and special-status species, among other goals.[17]  The Nesting Bird and Raptor Avoidance mitigation measure, however, appears to address only "impacts to nesting habitat for birds and raptors," and the EIR reported white-tailed kites do not typically nest in the Ballona Reserve.

The Department intends to implement Alternative 1 over two phases, and multiple stages within each phase, "to facilitate habitat restoration and plant establishment."  The Department anticipates Phase 1 will last up to five years and consist of 24 stages.  As stated, during Phase 1 the fill dumped in Area A

---

[17]     The trial court ruled the EIR's performance criteria violated CEQA by allowing the Department "to reduce restoration goals" without permitting the public to comment on any such modifications.  That ruling did not impact the substance of the stated performance criteria and required only that the Department include in its revised EIR a commitment to additional environmental review in the event the Department wanted to change the performance criteria in the future.

would be excavated over time and transported to build earthen levees during Phase 2. Portions of Areas B and C also would be cleared and graded during Phase 1. The draft EIR stated "ground-disturbing activities would proceed in stages, leaving a majority (74%) of upland areas available for foraging throughout the restoration process." The draft EIR also explained Phase 2 would not begin for at least 18 months after Phase 1 is complete "to facilitate habitat restoration and plant establishment." During that time, the Department would monitor and adapt new habitats as necessary to meet the Project's performance goals. In particular, the draft EIR stated the Department would prepare an "adaptive management plan" to "track restoration success relative to performance criteria and determine when criteria have been met [before] the restoration would proceed to its next phase." This plan would include ensuring "sensitive species would begin inhabiting the restored/enhanced areas." During construction, special-status wildlife species like the white-tailed kite would receive particular attention to "inform the need for active management of the species or habitats in which they reside."

In addition to phasing the Project, the Department plans "to salvage all native wildlife species of low mobility that may be killed or injured prior to and during Project-related vegetation or ground disturbances" to mitigate impacts during "ground-disturbing activities such as vegetation clearing, grubbing, and re-grading." "Salvaged species" would be "relocated to adjacent suitable habitat not subject to site disturbances." It is unclear from the record whether voles and mice are "low mobility" wildlife that require relocation; it is also unclear whether this mitigation measure is intended to benefit white-tailed kites.

39

Comments received during the public comment period asked whether temporary impacts from bulldozing and other ground-disturbing activities would have significant effects on wildlife currently living in the Ballona Reserve. One comment stated: "I saw no indication of any plans for any sort of relocation or even attempt to guide certain critters in a certain direction when the bulldozers close in. . . . [W]hat will happen to the species who lose their habitat due to massive bulldozing and berm-building operations . . . ?" Another said: "The Draft [EIR] does not explain how wildlife, plants and insects, including some threatened and endangered species, will be protected during the excavation of millions of cubic yards of sediment and soil. The proposition that the wildlife, plants and insects can be captured, retained and released back into the 'restored' environment is not feasible, nor is it credible." Several others asked variations on the question what will happen to the plants and wildlife currently living at the Ballona Reserve after certain areas are bulldozed.

The Department's responses to these comments explained that "the amount of [ground] disturbance would be as limited as possible to achieve the Project objectives" and that construction would be limited to "the minimal area necessary to complete the objectives of a given phase." The Department also said that "the area that would be disturbed by heavy machinery would be limited to the extent feasible" and that "salvaged wildlife species will be relocated to adjacent or nearby suitable habitat that is not subject to site disturbances, or has been previously restored as planned under the Project." In general, the Department referred commenters to the draft EIR's discussion of potential impacts to wildlife and to General Response 5 in the final EIR concerning

40

biological resources at the Project site.  General Response 5 also referred commenters to the draft EIR's discussion of special-status wildlife species.

> 2. *The Organization Has Not Shown the EIR's Discussion of Short-term Impacts to White-tailed Kites Was Insufficient*

The Organization argues the EIR failed to consider and disclose significant short-term impacts to the white-tailed kite caused by bulldozing its foraging habitat.[18]  "'Under CEQA, an agency must determine what, if any, effect on the environment a

---

[18]  The Department argues the Organization may not make this argument because none of the commenters raised this issue during the public comment period.  In particular, the Department contends none of the comments about white-tailed kites made "any claims about any short-term or other such temporary impacts on foraging habitat for this species that might occur during the initial phase of the Project."  As discussed, however, several comments addressed the short-term impacts on wildlife and habitats by ground-disturbing activities, and those comments were sufficiently detailed to give the Department an opportunity to address the short-term impacts on foraging habitat for special-status species like the white-tailed kite.  (See *California Natural Gas Vehicle Coalition v. State Air Resources Bd.*, *supra*, 105 Cal.App.5th at p. 327 ["[a]lthough not a perfect callout of the issue raised on appeal," the public comments were sufficient to allow an agency to decide the matter and to learn the contentions of interested parties]; see also § 21177, subd. (a); *Save the Hill Group v. City of Livermore* (2022) 76 Cal.App.5th 1092, 1104 [to attack a decision subject to CEQA, the alleged grounds for noncompliance must have been presented to the public agency with sufficient specificity to allow the agency to evaluate the issue and respond].)

proposed project may have.' [Citation.] To that end, the EIR 'must identify and discuss "all significant effects on the environment" of a proposed project.' [Citations.] The term "'[s]ignificant effect on the environment'" is defined as 'a substantial, or potentially substantial, adverse change in the environment.' [Citation.] Because a particular environmental effect can only be identified as significant after careful consideration, an EIR is required to discuss and analyze a possible impact of the project if there is a fair argument that it constitutes a significant effect on the environment." (*Yerba Buena Neighborhood Consortium*, *supra*, 95 Cal.App.5th at p. 802; accord, *Visalia Retail, LP v. City of Visalia* (2018) 20 Cal.App.5th 1, 13; see § 21068 [defining "'[s]ignificant effect on the environment'"].) "'An agency must find a "fair argument" if there is any substantial evidence to support that conclusion, even if there is competing substantial evidence in the record that the project will not have a significant environmental effect.'" (*Yerba Buena Neighborhood Consortium*, at p. 802; see *World Business Academy v. State Lands Commission* (2018) 24 Cal.App.5th 476, 499.) An agency must disclose "short- and medium-term environmental costs," as well as long-term impacts. (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority*, *supra*, 57 Cal.4th at p. 455.) "Though we might rationally choose to endure short- or medium-term hardship for a long-term, permanent benefit, deciding to make that tradeoff requires some knowledge about the severity and duration of the near-term hardship." (*Ibid.*)

As discussed at length, the EIR identified and analyzed potential short-term impacts to the foraging habitat of raptors like the white-tailed kite and various mitigation measures to

address them.  At a minimum, that discussion was "'a good faith effort at full disclosure.'"  (*Save the El Dorado Canal v. El Dorado Irrigation Dist.* (2022) 75 Cal.App.5th 239, 269; see *Center for Biological Diversity v. California Department of Conservation, etc.* (2019) 36 Cal.App.5th 210, 233.)

The Organization suggests the EIR was not forthcoming about the "immediate loss of approximately 200 acres of upland foraging habitat," though it is unclear where the Organization got the 200-acre figure.[19]  In any event, the draft EIR explained that Phase 1 will occur over the course of five years, that almost three-quarters of the site will be available for foraging raptors at any given time, and that monitors will ensure the habitats for special-status species such as the white-tailed kite meet stated performance criteria.  The Organization contends that "there is no analysis or disclosure of the acreage or percentage of White-tailed Kite habitat that will remain available" and that there is no source for the draft EIR's statement 74 percent of foraging habitat will remain available for foraging.  The Organization, however, does not cite any statute, case, or CEQA Guideline requiring that level of detail.  The EIR identified potential impacts to foraging habitats for raptors like the white-tailed kite, design features that will minimize such impacts (like phasing and sequencing construction over time), and mitigation measures to reduce any remaining impacts.  This analysis was sufficient for

---

[19]    The Organization may be rounding down from a figure provided in Table 2-3 in the draft EIR, "Alternative 1 Post Restoration Habitats and Acreages."  That table indicates the Project will impact 215.1 acres of "Upland" habitat, but that number appears to be the total amount impacted over the course of Phases 1 and 2, at the conclusion of which there will still be 195.8 acres of upland habitat.

43

the public to ""'intelligently take[ ] account of environmental consequences'"" (*Save the El Dorado Canal v. El Dorado Irrigation Dist.*, *supra*, 75 Cal.App.5th at p. 264) to white-tailed kites during construction and implementation.  (See *Center for Biological Diversity v. California Department of Conservation, etc., supra*, 36 Cal.App.5th at p. 233.)

The Organization also argues the Project's performance criteria showed the Project will have undisclosed significant short-term impacts on white-tailed kites because the criteria for upland scrub and grassland habitats state:  "The species richness and abundance of birds will not fall below 50% of pre-restoration levels after Year 1."  This statement, however, applied to all birds, including common (i.e., not special-status) bird species (of which there are well over 100 in the Ballona Reserve); the draft EIR addressed special-status birds like the white-tailed kite separately.  Moreover, the draft EIR stated white-tailed kites forage in habitats other than upland scrub and grasslands, which are the only habitats relevant to the performance criterion cited by the Organization.  To the extent white-tailed kites are subject to potentially significant short-term impacts, the other mitigation measures were designed to reduce those impacts to less-than-significant levels.  The Organization has not shown there is a fair argument anything not already disclosed by the EIR constituted a significant short-term effect on white-tailed kites.  (See *Yerba Buena Neighborhood Consortium*, *supra*, 95 Cal.App.5th at p. 802.)

3. *Substantial Evidence Supported the EIR's Finding There Were No Significant Short-term Impacts to White-tailed Kites*

The Organization makes a number of arguments seeking to cast doubt on the EIR's conclusion potential indirect impacts to raptors caused by changes to their foraging habitats could be reduced to a "less-than-significant level" through mitigation measures. None of these arguments, however, undermines the substantial evidence supporting the EIR's conclusion.

"Substantial evidence is "'enough relevant information and reasonable inferences . . . that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.'" [Citations.] Substantial evidence includes 'facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts,' but does not include '[a]rgument, speculation, unsubstantiated opinion or narrative.'" (*Upland Community First v. City of Upland*, *supra*, 105 Cal.App.5th at p. 13; see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393; § 21080, subd. (e)(1) & (2); CEQA Guidelines, § 15384, subds. (a), (b).) "'As with all substantial evidence challenges, an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry his burden.'" (*South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 330; see *County of Butte*, *supra*, 90 Cal.App.5th at p. 166; *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1265-1266.)

The Organization repeats its assertion the Project would cause an immediate loss of 200 acres of foraging habitat during Phase 1 without addressing the Department's evidence ground-disturbing activities would take place over time and with mitigation measures for special-status species (such as monitoring and active management) in place.  In its reply brief, the Organization similarly claims there would be "an immediate impact of 156.4 acres" on raptor foraging habitat, but that number represents the total acreage of Area A, which the draft EIR explains will be excavated over time and with mitigation measures.  Moreover, other habitats on the Project site, including non-tidal salt marsh in Area B and grasslands and coastal scrub in Areas B and C, will remain available to foraging raptors at various times during Phase I.  The Organization argues the Department's conclusion substantial portions of the Reserve will remain available for raptor foraging is an unsupported opinion, but the Organization has not shown the Department's five-year sequencing plan for Phase 1 will result in significant, temporary losses of foraging habitat.  Moreover, to the extent the Department's conclusion is an opinion, it is an expert opinion based on the implementation plan.  An agency may "'rely upon the opinion of its staff in reaching decisions, and the opinion of staff has been recognized as constituting substantial evidence.'" (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 900; see *ibid.* [substantial evidence supported an agency's opinion a mitigation measure reduced an environmental impact to a "less than significant level"]; *Center for Biological Diversity v. Department of Forestry & Fire Protection* (2014) 232 Cal.App.4th 931, 948 ["A public agency may

46

choose between differing expert opinions, and may also properly rely upon the opinion of its staff in reaching decisions."].)

The Organization also argues the mitigation measures identified in the EIR are not "designed to reduce indirect impacts to White-tailed Kites from the destruction of foraging habitat." But they are. Mitigation measures like the Habitat Restoration and Monitoring Plan call for "ongoing" monitoring of habitats to ensure their success based on stated performance criteria. And while not technically a mitigation measure, the planned phasing and sequencing, as discussed, are designed to minimize impacts to foraging habitats.

The Organization doubts whether relocating small mammals would successfully mitigate impacts on the white-tailed kite's foraging habitat, but, as stated, it is unclear whether this measure was even intended to address voles and mice. The Organization cites a study relied on by another commenter for the proposition that "[s]imply 'moving' the wildlife out of the path of immediate harm is not a mitigation measure because any suitable destination site would very likely already be occupied." Another study cited in the same comment and highlighted by the Organization observed California Meadow Voles are territorial, making relocation "a wholly inappropriate mitigation measure." The same commenter, however, said white-tailed kites prey on a different species of vole (the South Coast Marsh Vole), as well as common mice, and the Organization cites nothing suggesting these mammals will not survive in sufficient numbers for raptor foraging during the Project's phased implementation. More fundamentally, nothing cited by the Organization suggests the amount of habitat available for foraging at the Project site during

Phase 1 will not support the white-tailed kites that have been observed there.

G. *The Department's Responses to Comments Regarding Potential Long-term Impacts on White-tailed Kites Complied with CEQA*

1. *The Department Responds to Comments Regarding Losses to White-tailed Kite Habitat*

Under Alternative 1 a portion of the white-tailed kites' upland foraging habitat would be converted to tidal marsh, but according to the draft EIR, that habitat would provide foraging "that is comparable to or better than pre-Project conditions." To the extent indirect impacts on raptors remain after the Project's implementation, the draft EIR stated that use of the Nesting Bird and Raptor Avoidance mitigation measure, the Habitat Restoration and Monitoring Plan, and other measures would reduce them to a "less-than-significant level."

The Department received a public comment from the Los Angeles Audubon Society that included a report from Land Protection Partners on the Project. The report included two comments relevant to white-tailed kites, which the final EIR labeled O15-108 and O15-109. Comment O15-108 recommended the EIR address impacts to individual raptor species such as white-tailed kites because the evaluation of impacts on raptors depends on the abundance of their rodent prey in the post-implementation landscape. In particular, comment O15-108 cited

48

a study led by K.M. Wolf[20] concluding restored grasslands support fewer voles and mice (and therefore raptors) than unrestored grasslands dominated by invasive species.  Comment O15-108 further stated the Project should include "more high marsh and transitional habitats compared with middle and low marsh, tidal channels, and open water to make up for the predictable reduction in [rodent] density with restoration of annual grassland to a native vegetation type."

In response to comment O15-108, the final EIR stated: "Raptor foraging abilities at the Project Site will be largely retained through the phasing of the Project over time such that large areas of grassland habitat will be available to white-tailed kite . . . and other raptor species during and following restoration-related construction activities.  The replacement of several hundred acres of invasive monoculture stands with annual and perennial grasslands will provide an important improvement to foraging habitat for many raptor species.  The availability and quality of habitat on the site will change dramatically with the Project, and while the site may experience an overall lift in raptor foraging habitat quality when restored; the restoration effort may not benefit all raptors equally.  The [Wolf study] cited by [a] commenter is interesting, and found that an annual grassland and restored perennial grassland examined by the researcher had a slightly different capacity to support wildlife and raptors.[]  In comparing treatments, it found more wildlife, including raptors, on unrestored sites.  The commenter's suggestion that it is necessary to evaluate pre-project mouse and

---

[20]    See Wolf et al., *Rodent, snake and raptor use of restored native perennial grasslands is lower than use of unrestored exotic annual grasslands* (2018) 55 J. of Applied Ecology 1133.

49

vole densities, and modify the Project to provide more high marsh and transitional areas to increase future mouse and vole densities is interesting and unique, but such a study is not warranted to estimate future raptor use of the site, and is beyond the scale of what is required under CEQA.  Under CEQA, projects are not required to balance current and future raptor foraging capacity.  Following project implementation, the site will continue support [for] small mammals such as mice and voles, which are an important foraging species for many raptors including white-tailed kite, and is expected to support many of the same raptor species that presently use the site."  The final EIR's response to comment O15-108 also referred to responses to comments concerning potential impacts to raptors, which, in turn, referred to portions of the draft EIR addressing raptors and their habitat.

Comment O15-109 observed that Alternative 1 would reduce upland habitat by 76 acres, plus another 12 acres of trails, and that 36 acres of vegetation would be affected by the Corps' maintenance requirements.  In response to this loss, the draft EIR stated, "Although a portion of suitable upland foraging habitat would be converted to tidal marsh, the marsh also would provide suitable foraging habitat for these species, and thus no net loss of foraging habitat is expected."  Comment O15-109 faulted the draft EIR for failing to provide evidence "upland bird species of concern" could forage in salt marsh.  The comment concluded it was "highly unlikely" that "all of the upland species" will have "additional habitat" after Alternative 1's implementation.  The comment did not list the white-tailed kite among the species of upland birds at issue.

In response to comment O15-109, the final EIR referred to the draft EIR's discussion of impacts on special-status upland birds and stated: "[The Department] believes that the retaining and restoring 195 acres of the 271 total 'upland' acres of existing upland habitat within the Ballona Reserve would retain substantial areas for use by special-status upland bird species, adequately offset impacts to foraging from 76 acres of habitat loss, and would not result in a reduction in grassland species range or extirpation of species. [The Department] acknowledges that the commenter may reach different conclusions based on the evidence presented, but this difference of opinion does not indicate that the EIR is inadequate or inaccurate."

### 2. *Applicable Law*

"After the designated lead agency makes a draft EIR available to the public, the public may comment on the draft. The lead agency must evaluate and respond to timely comments relating to significant environmental issues, and include the comments and responses in the final EIR. The agency's response must demonstrate a good faith, reasoned analysis, but need not be exhaustive. The response can be sufficient if it refers to parts of the draft EIR that analyzes the environmental impacts raised by the comment. Furthermore, general comments can be met with general responses, and comments that are only objections to the merits of the project itself may be addressed with cursory responses." (*Save the El Dorado Canal v. El Dorado Irrigation Dist., supra,* 75 Cal.App.5th at p. 268, cleaned up; see *Los Angeles Conservancy v. City of West Hollywood* (2017) 18 Cal.App.5th 1031, 1039-1040; CEQA Guidelines, § 15088.)

51

### 3.    *The Department's Responses to Comments O15-108 and O15-109 Were Sufficient*

The Organization argues the Department's responses to comments O15-108 and O15-109 were "impermissibly conclusory."  The Organization contends the Department "must do more than simply claim that habitat improvements will mitigate the permanent loss of foraging habitat for White-tailed Kites."  But it did.  The Department responded to the comments directly and with references to the draft EIR's discussion of the potential environmental impacts to raptors and their foraging habitats.  The Organization has not explained how those responses failed to address the ways in which the Department plans to mitigate the loss of certain foraging habitat for white-tailed kites.

The Organization contends the Department's "'opinion' that habitat improvements will mitigate the permanent loss of 76 acres is not supported by substantial evidence."  But the Department's statement that "no net loss of foraging habitat is expected" was based not on its opinion, but on the total amount of foraging habitat anticipated after the Project's implementation.  In addition to almost 200 acres of upland habitat, the Project also will create approximately 9 acres of non-tidal salt marsh and 54 acres of high marsh, which the Department and Land Protection Partners identified as possible foraging habitat for raptors.  And again, the Organization does not contend or point to any evidence suggesting this amount of habitat cannot support the two to three white-tailed kites that forage in the Ballona Reserve.

The Organization also argues the Department cannot discount evidence in the Wolf study showing restored habitats

52

may reduce vole and mice populations and therefore impact raptor density.  The Department, however, responded to that evidence by stating that the Wolf study showed only a "slightly different capacity to support wildlife and raptors" in restored areas and that "CEQA projects are not required to balance current and future raptor foraging capacity."  Indeed, so long as there is no significant environmental impact on raptor foraging capacity, the Department need not attempt to mitigate its loss. (See *County of Butte*, *supra*, 90 Cal.App.5th at p. 158; CEQA Guidelines, § 15063, subd. (d)(4).)  As the Department also points out, the Organization has not cited any evidence the restored habitats addressed in the Wolf study are comparable to the habitats in the Ballona Reserve or involve the same vegetation types or climate conditions.

Finally, the Organization contends the Department failed to account for sea level rise that will convert portions of Areas A and B to mudflats by 2050 and to open water by 2100, neither of which will provide habitat for white-tailed kites and other terrestrial bird species.  But as the Department argues, "the purpose of an EIR is to identify the significant effects of a project on the environment, not the significant effects of the environment on the project."  (*Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 473.)  In *Ballona Wetlands Land Trust* the court held an EIR need not address "the impacts of the project on the surrounding area in the event of sea level rise resulting from global climate change."  (*Id*. at p. 475; see *City of Long Beach v. Los Angeles Unified School Dist*. (2009) 176 Cal.App.4th 889, 905 [EIR for a school project need not address the cumulative effects of air quality in the area on staff and student health].)  The EIR was not deficient for failing to

address or mitigate the effect of sea level rise on raptor foraging habitats.[21]

## DISPOSITION

The judgment is affirmed.  The Department is to recover its costs on appeal.

SEGAL, Acting P. J.

We concur:

FEUER, J.

STONE, J.

---

[21]     We do not address the Organization's contention, articulated for the first time in its reply brief, there is a fair argument the Project may have permanent impacts on white-tailed kite foraging habitat.  (See *Golden Door Properties, LLC v. County of San Diego, supra*, 50 Cal.App.5th at p. 518.)  Even if we were to consider the argument, the Organization has not cited evidence showing the loss of upland foraging habitat in light of mitigation measures and other newly established habitat would have a significant impact on the two to three white-tailed kites currently foraging at the Ballona Reserve.